[Crim. No. 23783. Sept. 16, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
JESSE SKINNER, Defendant and Appellant.

766

**COUNSEL**

Charles M. Sevilla, under appointment by the Supreme Court, and Cleary & Sevilla for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Norman H. Sokolow, Beverly K. Falk and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

Christopher N. Heard and Terry L. White as Amici Curiae on behalf of Plaintiff and Respondent.

## Opinion

**GRODIN, J.**—For over a century prior to the decision in *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318], California courts framed this state's definition of insanity, as a defense in criminal cases, upon the two-pronged test adopted by the House of Lords in *M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722]: "[T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; *or,* if he did know it, that he did not know he was doing what was wrong." (Italics added; see *People* v. *Coffman* (1864) 24 Cal. 230, 235.)

Over the years the M'Naghten test became subject to considerable criticism and was abandoned in a number of jurisdictions. In *Drew* this court followed suit, adopting the test for mental incapacity proposed by the American Law Institute: "'A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.'" (*Drew, supra,* 22 Cal.3d at p. 345.)

In June 1982 the California electorate adopted an initiative measure, popularly known as Proposition 8, which (among other things) for the first time in this state established a statutory definition of insanity: "In any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act *and* of distinguishing right from wrong at the time of the commission of the offense." (Pen. Code, § 25, subd. (b) [hereafter section 25(b)], italics added.)[1]

---

[1]Unless otherwise indicated all future statutory references are to the Penal Code.

It is apparent from the language of section 25(b) that it was designed to eliminate the *Drew* test and to reinstate the prongs of the M'Naghten test. However, the section uses the conjunctive "and" instead of the disjunctive "or" to connect the two prongs. Read literally, therefore, section 25(b) would do more than reinstate the M'Naghten test. It would strip the insanity defense from an accused who, by reason of mental disease, is incapable of knowing that the act he was doing was wrong. That is, in fact, the interpretation adopted by the trial court in this case.

Defendant claims that the purpose of the electorate in adopting section 25(b) was to restore the M'Naghten test as it existed in California prior to this court's decision in *People v. Drew, supra,* 22 Cal.3d 333. If read literally, he argues, section 25(b) would violate both the state and federal Constitutions by imposing criminal responsibility and sanctions on persons who lack the mens rea essential to criminal culpability.

The People do not dispute the proposition that the intent of the electorate was to reinstate the pre-*Drew* test of legal insanity. They argue, however, that section 25(b), "amplifies" and "clarifies" the M'Naghten test. Amicus curiae, the Criminal Justice Legal Foundation, agrees that the intent was not to adopt a stricter test than that applicable prior to *Drew,* but suggest that in fact there is no difference between the two prongs of the M'Naghten test—ability to distinguish between right and wrong, and knowledge of the nature and quality of the particular criminal act.

Mindful of the serious constitutional questions that might arise were we to accept a literal construction of the statutory language, and of our obligation wherever possible both to carry out the intent of the electorate and to construe statutes so as to preserve their constitutionality (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281]; *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 598 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; *People v. Amor* (1974) 12 Cal.3d 20, 30 [114 Cal.Rptr. 765, 523 P.2d 1173]), we shall conclude that section 25(b) was intended to, and does, restore the M'Naghten test as it existed in this state before *Drew.* We shall also conclude that under that test there exist two distinct and independent bases upon which a verdict of not guilty by reason of insanity might be returned.

I

Defendant appeals from a judgment of conviction of second degree murder (§§ 187, 189) entered upon his pleas of nolo contendere and not guilty by reason of insanity (§ 1016, subds. 3, 6), and a finding by the court, after

a jury was waived, that he was sane at the time of the offense. (§ 1026, subd. (a).) In finding the defendant sane, the judge acknowledged that it was more likely than not that defendant suffered from a mental disease, paranoid schizophrenia, which played a significant part in the killing. The judge stated that under the *Drew* test of legal insanity defendant would qualify as insane, and also found that "under the right-wrong prong of section 25(b), the defendant would qualify as legally insane; but under the other prong, he clearly does not." Concluding that by the use of the conjunctive "and" in section 25(b), the electorate demonstrated an intent to establish a stricter test of legal insanity than the M'Naghten test, and to "virtually eliminate" insanity as a defense, the judge found that defendant had not established that he was legally insane.

Probation was denied and defendant was sentenced to a term of 15 years to life in the state prison.

Defendant strangled his wife while he was on a day pass from the Camarillo State Hospital at which he was a patient. Evidence offered at the trial on his plea of not guilty by reason of insanity included the opinion of a clinical and forensic psychologist that defendant suffered from either classical paranoic schizophrenia, or schizoaffective illness with significant paranoid features. A delusional product of this illness was a belief held by defendant that the marriage vow "till death do us part" bestows on a marital partner a God-given right to kill the other partner who has violated or was inclined to violate the marital vows, and that because the vows reflect the direct wishes of God, the killing is with complete moral and criminal impunity. The act is not wrongful because it is sanctified by the will and desire of God.

Although there was also evidence that would have supported a finding that defendant was sane, it was apparently the evidence summarized above upon which the trial judge based his finding that defendant met one, but not both, prongs of the M'Naghten test. Defendant knew the nature and quality of his act. He knew that his act was homicidal. He was unable to distinguish right and wrong, however, in that he did not know that this particular killing was wrongful or criminal.

 In this context we must determine whether the trial court's conclusion that section 25(b), requires that a defendant meet both prongs of the M'Naghten test to establish legal insanity was correct, and if not, whether the court's finding that defendant met the "right-wrong" aspect of the test requires reversal with directions to enter a judgment of not guilty by reason of insanity.

## II

### *The Insanity Defense in California*

"It is fundamental to our system of jurisprudence that a person cannot be convicted for acts performed while insane. (*People* v. *Nash* (1959) 52 Cal.2d 36, 50-51; . . .)" (*People* v. *Kelly* (1973) 10 Cal.3d 565, 574 [111 Cal.Rptr. 171, 516 P.2d 875].) This rule is one aspect of the equally well established and no less fundamental principle that wrongful intent is an essential element of crime, a principle reflected in the first statutory criminal law scheme adopted by our Legislature in 1850. The Act Concerning Crimes and Punishments (Stats. 1850, ch. 99, p. 229) set forth this principle and its applicability to the insane as the first three sections of the law:

"§ 1. In every crime or public offence there must be a union or joint operation of act and intention, or criminal negligence.

"§ 2. Intention is manifested by the circumstances connected with the perpetration of the offence, and the sound mind and discretion of the person accused.

"§ 3. A person shall be considered of sound mind who is neither an idiot, nor lunatic, nor affected with insanity, and who hath arrived at the age of fourteen years; or before that age, if such person knew the distinction between good and evil."[2]

The principle that wrongful intent or criminal mens rea is an essential element of crime was carried over into the Penal Code of 1872 which incorporated section 1 of the Act Concerning Crimes and Punishments as section 20 of the code, and expanded the classes of persons deemed incapable of committing crime. Section 26, as adopted in 1872, provided that "[a]ll persons are capable of committing crimes, except those belonging to the following classes:

"1. Children under the age of fourteen years, in the absence of clear proof that at the time of committing the act charged against them, they knew of its wrongfulness;

---

[2]Further recognition was given to this principle as applied to the insane with the enactment of the Act to Regulate Proceedings in Criminal Cases in 1851. (Stats. 1851, ch. 29, p. 212.) Section 583 of that act provided: "An Act done by a person in a state of insanity cannot be punished as a public offence, nor can a person be tried, adjudged to punishment, or punished for a public offence, while he is insane." (*Id.*, at p. 277.)

"2. Idiots;

"3. Lunatics and insane persons;

"4. Persons who committed the act or made the omission charged, under an ignorance or mistake of fact which disproves any criminal intent;

"5. Persons who committed the act charged, without being conscious thereof;

"6. Persons who committed the act or made the omission charged, through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence;

"7. Married women (unless the crime be punishable with death) acting under the threats, command, or coercion of their husbands;

"8. Persons (unless the crime be punishable with death) who committed the act or made the omission charged, under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."

When the Penal Code of 1872 was submitted to the Legislature for adoption, the accompanying comments of the code commissioners reflected sensitivity to the principle of criminal responsibility that had been expressed by the court in implementing the prior law. With regard to section 20, the commissioners noted: "The opinion of the Court in *People* vs. *Harris* [(1866) 29 Cal. 678] is given at length because it is a correct and authoritative exposition of Sec. 20; . . . Says Mr. Bishop (1 Bishop's Cr. Law, Sec. 227): 'There is only one criterion by which the guilt of men is to be tested. It is whether the mind is criminal. Criminal law relates only to crime, and neither in philosophical speculation nor in religious or moral sentiment would any people in any age allow that a man should be deemed guilty unless his mind were so. It is, therefore, a principle of our legal system, as probably of every other, that the essence of an offense is the wrongful intent, without which it cannot exist.' The opinion of Mr. Bishop finds full support in the following adjudged cases.—United States vs. Pearce, 2 McLean, p. 14; Weaver vs. Ward, Hob., p. 134; Rex vs. Fell, 1 Salk., p. 272, Lancaster's Case, 1 Leon., p. 208 . . . ." (Code Commissioners' note, Pen. Code of Cal. (1st ed. 1872) p. 21.)

As to section 21, which essentially incorporated sections 2 and 3 of the 1850 act, the commissioners noted that "[t]he natural and probable consequences of every act deliberately done are presumed to have been intended

by the author of the act, *if of sane mind.*" (*Ibid.*) It was then understood, although the plea of not guilty by reason of insanity was not added to sections 1016 and 1017 until 1927 (Stats. 1927, ch. 677, §§ 1, 2, pp. 1148-1149), that the insanity defense could be offered under a plea of not guilty. (Code Commissioners' note, Pen. Code of Cal. (1st ed. 1872) p. 341.)

The test of legal insanity when the Penal Code of 1872 was adopted by the Legislature was the two-prong M'Naghten test recognized by this court in *People* v. *Coffman, supra,* 24 Cal. 230, 235: "The unsoundness of mind, or insanity, that will constitute a defense in a criminal action is well described by Tindal, C. J., in answer to questions propounded by the House of Lords to the Judges [citation]. He says, 'that to establish a defense on the ground of insanity, it must be clearly proved that, at the *time* of committing the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know *the nature or quality of the act,* or if he did know it, that he did not know he was doing *what was wrong.*' " (Original italics.) *Coffman*'s exposition of the M'Naghten test was set out in the commissioners' note to section 1016, confirming the legislative understanding of the applicable definition of legal insanity.

For more than a century after *Coffman* recognized the M'Naghten test as applicable in this state it continued to be used, and although sometimes stated in the conjunctive, was in fact applied so as to permit a finding of insanity if either prong of the test was satisfied.[3] We stated the test in the disjunctive in *Drew* and the instructions given by the trial court in that case did so also. (22 Cal.3d at pp. 336, fn. 2, 339.)[4]

---

[3]See, e.g., *People* v. *Hoin* (1882) 62 Cal. 120, stating the test in the disjunctive, but quoting two English decisions which, although the conjunctive had been used, suggest in context that the court's meaning was that sanity would be found only if the defendant both knew the nature and character of his act and knew that his act was wrong. To the same effect *People* v. *Willard* (1907) 150 Cal. 543, 554 [89 P. 124] ("Although he may be laboring under partial insanity,—as, for instance suffering from some insane delusion or hallucination,—still if he understands the nature and character of his action and its consequences,—if he has knowledge that it is wrong and criminal, and that if he does the act he will do wrong, such partial insanity . . . is not sufficient to relieve him from responsibility for his criminal acts."). That the *Willard* formulation did no more than amplify the two-prong test, and did not change the test, was made clear in *People* v. *Gilberg* (1925) 197 Cal. 306, 313-314 [240 P. 1000], and *People* v. *Sloper* (1926) 198 Cal. 238, 245 [244 P. 362], where it is quoted as an application of the disjunctive formulation.

[4]By far the vast majority of cases have either stated the test in the disjunctive or have worded it affirmatively stating that the defendant is sane if he is capable of appreciating the nature of his act *and* knows it is wrong. (See, e.g., *People* v. *Darling* (1962) 58 Cal.2d 15, 22 [22 Cal.Rptr. 484, 372 P.2d 316]; *People* v. *Nash* (1959) 52 Cal.2d 36, 43-44, fn. 3 [338 P.2d 416]; *People* v. *Baker* (1954) 42 Cal.2d 550, 568 [268 P.2d 705]; *People* v. *Kimball* (1936) 5 Cal.2d 608, 610 [55 P.2d 483]; *People* v. *Keaton* (1931) 211 Cal. 722, 724 [296 P. 609]; *People* v. *Koehn* (1929) 207 Cal. 605, 612 [279 P. 646]; *People* v. *Gilberg, supra,* 197 Cal. 306, 313; *People* v. *Williams* (1920) 184 Cal. 590, 593 [194 P.

Because our statutes requiring mens rea, and our past formulation of the M'Naghten and ALI-*Drew* tests of insanity have afforded adequate defense to mentally ill persons who lack wrongful intent and might otherwise be subject to penal sanctions, we have not been called upon to consider the constitutional implications of the imposition of punishment on persons who act without that intent. Nor has the United States Supreme Court done so, although that court, too, has recognized repeatedly that except in regulatory offenses in which the sanctions are relatively light (*United States* v. *Dotterweich* (1943) 320 U.S. 277, 280-281 [88 L.Ed. 48, 51-52, 64 S.Ct. 134]), the existence of wrongful intent is essential to criminal liability. (See *United States* v. *Bailey* (1980) 444 U.S. 394, 402 [62 L.Ed.2d 575, 585, 100 S.Ct. 624]; *Morissette* v. *United States* (1952) 342 U.S. 246, 250-251 [96 L.Ed. 288, 293-294, 72 S.Ct. 240]; cf. *United States* v. *Balint* (1922) 258 U.S. 250 [66 L.Ed. 604, 42 S.Ct. 301].)

Because mens rea or wrongful intent is a fundamental aspect of criminal law, the suggestion that a defendant whose mental illness results in inability to appreciate that his act is wrongful could be punished by death or imprisonment raises serious questions of constitutional dimension under both the due process and cruel and unusual punishment provisions of the Constitution. In *Leland* v. *Oregon* (1952) 343 U.S. 790 [96 L.Ed. 1302, 72 S.Ct. 1002], the court upheld an Oregon law placing the burden of proving insanity beyond a reasonable doubt on the defendant and affirmed the right of the state to formulate the applicable test of legal insanity. In so doing, however, the court measured the law under due process standards, concluding that the irresistible impulse extension of the traditional insanity test was not " 'implicit in the concept of ordered liberty.' " (343 U.S. at p. 801 [96 L.Ed. at p. 1310].) The court thus seemingly accepted the proposition that

---

1019]; *People* v. *Oxnam* (1915) 170 Cal. 211, 213 [149 P. 165]; *People* v. *Hubert* (1897) 119 Cal. 216, 223 [51 P. 329]; *People* v. *M'Donell* (1873) 47 Cal. 134, 135.)

Both *People* v. *Reid* (1924) 193 Cal. 491, 496 [225 P. 859], and *People* v. *Bundy* (1914) 168 Cal. 777, 779 [145 P. 537], state the test affirmatively in the conjunctive. In *Bundy* the court approved the jury instruction which stated: " 'If he has reasoning capacity sufficient to distinguish between right and wrong as to the particular act he is doing, knowledge and consciousness that what he is doing is wrong and criminal and will subject him to punishment, he must be held responsible for his conduct.' " In *Reid*, where sufficiency of the evidence was in issue, the court found the evidence was not sufficient to establish that defendant did not know that his act of robbery was wrongful *or* did not understand the nature of his act. Both cases are consistent with the rule that a defendant who establishes either prong has satisfied the M'Naghten test as applied in California.

The instruction on insanity most commonly given prior to *Drew* (CALJIC No. 4.00 (3d ed. 1970)) stated the rule in both formulations: "If you find that the defendant was capable of knowing and understanding the nature and quality of his act and, in addition, was capable of knowing and understanding that his act was wrong, you will find that he was legally sane. [¶] However, if you find that the defendant was not capable of knowing or understanding the nature and quality of his act, you will find that he was legally insane; or, if you find that he was incapable of knowing or understanding that his act was wrong, you will find that he was legally insane."

the insanity defense, in some formulation, *is* required by due process. (See also *Robinson* v. *California* (1962) 370 U.S. 660, 666 [8 L.Ed.2d 758, 762, 82 S.Ct. 1417], suggesting that punishment for the status of being mentally ill would constitute cruel and unusual punishment.) Scholars, too, suggest that abolition of the traditional insanity defense may be constitutionally impermissible if the result would be imposition of punishment on a mentally ill person for acts done without criminal intent. (See Robitscher & Haynes, *In Defense of the Insanity Defense* (1982) 31 Emory L.J. 9; Note, *The Proposed Federal Insanity Defense: Should the Quality of Mercy Suffer for the Sake of Safety* (1984) 22 Am.Crim. L.Rev. 49.)

This court suggested a similar view in *People* v. *Coleman* (1942) 20 Cal.2d 399, 407 [126 P.2d 349], where we observed: "Obviously an insane person accused of crime would be inhumanely dealt with if his insanity were considered merely to reduce the degree of his crime or the punishment therefor."[5]

We need not face these difficult constitutional questions, however, if section 25(b) does no more than return to the pre-*Drew* California version of the M'Naghten test.

### III

*Post-Proposition 8 Return to M'Naghten*

■ If the use of the conjunctive "and" in section 25(b) is not a draftsman's error, a defendant must now establish both that he "was incapable of knowing or understanding the nature and quality of his or her act *and* of distinguishing right from wrong." ■ We recognize the basic principle of statutory and constitutional construction which mandates that courts, in construing a measure, not undertake to rewrite its unambiguous language. (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 348 [158 Cal.Rptr. 350, 599 P.2d 656].) That rule is not applied, however, when it appears clear that a word has been erroneously used, and a judicial correction will best carry out the intent of the adopting body. (*Pepper* v. *Board of Directors* (1958) 162 Cal.App.2d 1, 4 [327 P.2d 928].) The inadvertent use of "and" where the purpose or intent of a statute seems clearly to require "or" is a familiar example of a drafting error which may properly be rectified by judicial construction. (See, e.g., *People* v. *Bigelow* (1984) 37 Cal.3d 731, 755-756 [209 Cal.Rptr. 328, 691 P.2d 994]; *Bianco* v. *Ind. Acc. Com.* (1944) 24 Cal.2d 584, 587 [150 P.2d 806]; *People* v.

---

[5]For a contrary view, see Morris, Madness and Criminal Law (Chi. Press 1982) page 76. See also Keilitz and Fulton, The Insanity Defense (Nat. Center for State Courts 1984).

*Butler* (1978) 81 Cal.App.3d Supp. 6, 8 [146 Cal.Rptr. 856]; *Abbey* v. *Board of Directors* (1922) 58 Cal.App. 757, 760 [209 P. 709].) ▮▮▮ Whether the use of "and" in section 25(b) is, in fact, a drafting error can only be determined by reference to the purpose of the section and the intent of the electorate in adopting it.

The ballot summaries and arguments are not helpful. The Attorney General's summary of Proposition 8 advises only that the measure included a provision "regarding . . . proof of insanity." (Official title and summary, Prop. 8, Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec. (June 8, 1982) p. 32.) The analysis of the Legislative Analyst quotes the conjunctive language and states only that the provision "could increase the difficulty of proving that a person is not guilty by reason of insanity." (*Id.,* at p. 55.) No reference to the insanity provision appears in the arguments for or against Proposition 8. (*Id.,* at pp. 34-35.) These omissions are not without significance, however. As we noted earlier, the insanity defense reflects a fundamental legal principle common to the jurisprudence of this country and to the common law of England[6] that criminal sanctions are imposed only on persons who act with wrongful intent in the commission of a *malum in se* offense. (See *Morissette* v. *United States, supra,* 342 U.S. 246, 250-251 [96 L.Ed. 288, 293-294].) Since 1850 the disjunctive M'Naghten test of insanity has been accepted as the rule by which the minimum cognitive function which constitutes wrongful intent will be measured in this state. As such it is itself among the fundamental principles of our criminal law. Had it been the intent of the drafters of Proposition 8 or of the electorate which adopted it both to abrogate the more expansive ALI-*Drew* test and to abandon that prior fundamental principle of culpability for crime, we would anticipate that this intent would be expressed in some more obvious manner than the substitution of a single conjunctive in a lengthy initiative provision. (Cf. *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 734 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161], cert. den., 459 U.S. 958 [74 L.Ed.2d 111, 103 S.Ct. 129]; *Rooney* v. *Vermont Investment Corp.* (1973) 10 Cal.3d 351, 364-365 [110 Cal.Rptr. 353, 515 P.2d 297]; *In re Cox* (1970) 3 Cal.3d 205, 215 [90 Cal.Rptr. 24, 474 P.2d 992]; *Interinsurance Exchange* v. *Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142, 152 [23 Cal.Rptr. 592, 373 P.2d 640].)

Applying section 25(b) as a conjunctive test of insanity would erase that fundamental principle. It would return the law to that which preceded

---

[6]This concept of criminal responsibility is not one limited to the laws of this country and of England. In their article on the development of the insanity defense in California, Platt and Diamond trace the defense to Hebrew law, and also find the doctrine of criminal responsibility a recognized part of Greek and Roman philosophy. (Platt & Diamond, *The Origins of the "Right and Wrong" Test of Criminal Responsibility and Its Subsequent Development in the United States: An Historical Survey* (1966) 54 Cal.L.Rev. 1227.)

M'Naghten, a test known variously as the "wild beast test" and as the "good and evil test" under which an accused could be found insane only if he was "totally deprived of his understanding and memory, and doth not know what he is doing, no more than an infant, than a brute, or a wild beast . . . ." (*Rex* v. *Arnold* (1724) 16 Howell St. Tr. 695, 765.)[7] We find nothing in the language of Proposition 8, or in any other source from which the intent of the electorate may be divined which indicates that such a fundamental, far-reaching change in the law of insanity as that was intended.[8]

In *People* v. *Horn* (1984) 158 Cal.App.3d 1014, 1029-1031 [205 Cal.Rptr. 119], the Court of Appeal considered the absence of any indicia of intent to accomplish more than restoration of the California version of the M'Naghten test and found the use of the traditional, century old phraseology of M'Naghten persuasive evidence of an intent to return to that test, notwithstanding the apparently inadvertent use of the conjunctive "and."

We conclude, as did the Court of Appeal in *Horn* that section 25(b) reinstated the M'Naghten test as it was applied in California prior to *Drew* as the test of legal insanity in criminal prosecutions in this state.[9]

## IV

■ Although the People agree that the purpose of section 25(b) was to return the test of legal insanity in California to the pre-ALI-*Drew* version of the M'Naghten test, they argue that reversal of this judgment is not required because both prongs of that test are actually the same. The findings of the trial judge in this case illustrate the fallacy inherent in this argument. It is true that a person who is unaware of the nature and quality of his act

---

[7]The development of the "good and evil" test in England prior to *M'Naghten's Case* is summarized in Platt and Diamond, *op. cit. supra.*

[8]A test of insanity requiring that a defendant meet both prongs of the M'Naghten test would not, of course, carry out the intent that was express in Proposition 8 and in the materials supplied to the voters. That intent, insofar as the criminal justice system is concerned, is deterrence of criminal behavior. (See *People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149].) A person who does not know his act is wrong is not likely to be deterred by the prospect of punishment for wrongful conduct. Nor is there a prospect that one who does not know the nature of his act will be deterred.

[9]In somewhat more colorful language, the Court of Appeal "decline[d] to interpret the statute as enacting a new drooling idiot test in place of the century old M'Naghten standard merely because it uses the single, and often misused, conjunctive 'and.' That conjunctive is too thin a reed to support such a massive doctrinal transformation." (*People* v. *Horn, supra,* 158 Cal.App.3d 1014, 1032.)

by definition cannot know that the act is wrong. In this circumstance the "nature and quality" prong subsumes the "right and wrong" prong.[10]

The reverse does not necessarily follow, however. The expert testimony in this case supported the findings of the trial court that this defendant was aware of the nature and quality of his homicidal act. He knew that he was committing an act of strangulation that would, and was intended to, kill a human being. He was not able to comprehend that the act was wrong because his mental illness caused him to believe that the act was not only morally justified but was expected of him. He believed that the homicide was "right."

The People argue further that section 25(b) was intended to "clarify" the meaning of the right/wrong prong of the California M'Naghten test by establishing that the "wrong" which the defendant must comprehend is a legal, rather than a moral wrong. Under this formulation this defendant, who was able to recognize that his act was unlawful, would not escape criminal responsibility even though he believed his act was commanded by God. We fail to see the manner in which section 25(b) conveys this clarification of the M'Naghten test. Moreover, even assuming the validity of this argument, reversal here would be necessary. The trial court did not find that appellant was able to comprehend that his act was considered unlawful or "wrong" even though it was commanded by God. That theory does not appear to have been put forth by the People at trial.[11] Neither appellant, nor the trial court addressed the question of ability to comprehend legal right or wrong.

In any event, past decisions do not support the People's argument that under the California version of the M'Naghten test a defendant who could comprehend that his act was unlawful could not be legally insane. That was certainly not the understanding at the time of the adoption of the Penal Code of 1872. The notes accompanying section 26 of that enactment refer to

[10]Illustrative of this is *People* v. *Richardson* (1961) 192 Cal.App.2d 166, 172-173 [13 Cal.Rptr. 321], in which the use of the conjunctive "and" in the insanity instruction was criticized and held erroneous, but not prejudicial because the defense was that the defendant had "blacked-out." "Under these circumstances, where the only evidence of insanity offered by the appellant was 'blackout' periods, there can be no relevance of a distinction between 'knowing the nature and quality of his act' and 'distinguishing between right and wrong in relation to the act . . . .'"

[11]The failure to do so may be explained in part by the inconsistency of this theory of the intent of section 25(b), with the theory put forth by the Attorney General in the Attorney General's Guide to Proposition 8 (reprinted in Criminal Practice After Proposition 8 (Cont.Ed.Bar 1982) pp. 145-316 [hereafter CEB]), which was distributed to prosecutors and other local law enforcement officers. There it was stated that section 25(b) "restores the traditional M'Naghten rule as to insanity, *People* v. *Kelly* (1973) 10 Cal.3d 565, 574." (CEB, *op. cit. supra,* at p. 261.)

*People* v. *Coffman, supra,* 24 Cal. 230, which, as we have observed, is the case in which the M'Naghten test was recognized as being applicable in this state. The *Coffman* opinion, in addition to stating the test, considered the standard of proof, quoting as it did so: "Mansfield, Chief Justice, in Billingham's case, 1 Collinson on Lunacy, 636 . . .: 'To support such a defense, (insanity,) it ought to be proved . . . that the person was incapable of judging between right and wrong; . . . that at the time he committed the act he did not consider that murder was a crime *against the laws of God and nature* . . . .'" (24 Cal. at p. 236, italics added.)

No such restriction on the availability of the insanity defense was reflected by the standard instruction on insanity, CALJIC No. 4.00, prior to *Drew.* That instruction did not make a distinction between moral wrong and legal wrong, advising the jury only that if the defendant was not capable of understanding that his act was "wrong," he should be found insane.[12] Nor is the limitation urged by the People stated in *People* v. *Kelly, supra,* 10 Cal.3d 565, our last pre-*Drew* application of the M'Naghten test. There we stated: "Insanity, under the California M'Naghten test, denotes a mental condition which renders a person incapable of knowing or understanding the nature and quality of his act, or incapable of distinguishing right from wrong in relation to that act. (*People* v. *Wolff* (1964) 61 Cal.2d 795, 801 [40 Cal.Rptr. 271, 394 P.2d 959].)" (*People* v. *Kelly, supra,* 10 Cal.3d 565, 574.) We did not suggest that such a limitation was relevant to the evidence and findings in that case where the trial court had determined that the defendant " 'was not capable of understanding that her act was wrong.' " (*Ibid.*)

The concept of "wrong" was not limited to legal wrong in *People* v. *Wolff* (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959]. There this court explained that the California version of the M'Naghten test had been liberalized by holding that "knowing" in the sense of being able to verbalize the concepts of right and wrong was insufficient to establish legal sanity. Rather, the defendant must "know" in a broader sense—he must appreciate or understand these concepts. Tracing the evolution of the California test we summarized the cases from which the then applicable instruction had been derived, stating: "(See, e.g., *People* v. *Willard* (1907) 150 Cal. 543, 554 [83 P. 124] ['if he *understands* the nature and character of his action and its consequences']; *People* v. *Harris* (1914) 169 Cal. 53, 61 [145 P. 520] ['having mental capacity to know *and understand* the nature and character of the act he was committing'] *People* v. *Oxnam* (1915) 170 Cal. 211, 213 [149 Cal.Rptr. 165] ['If appellant . . . had sufficient mental capacity to *appreciate* the character and quality of his act, knew *and understood* that it

---

[12]See footnote 4, *ante.*

was a violation of the rights of another . . . , if he had the capacity thus to *appreciate* the character and comprehend the possible consequence of his act']; *People* v. *Morisawa* (1919) 180 Cal. 148, 150 [179 P. 888] ['if the defendant . . . did not *appreciate* the act he was committing']; *People* v. *Gilberg* (1925) 197 Cal. 306, 314 [3] [240 P. 1000] ['he *appreciated* the nature and the quality of the act']; *People* v. *Wells* (1949) 33 Cal.2d 330, 351 [20] [202 P.2d 53] ['to know the nature of his act *and appreciate* that it was wrongful and could subject him to punishment'] . . . .)" (*People* v. *Wolff, supra,* 61 Cal.2d 795, 800-801.) In none of these cases is it suggested that a defendant whose mental illness caused him to believe that his act was morally correct could not be found insane if he understood that the act was unlawful.

Cases subsequent to *Coffman* accept inability to appreciate moral wrong as a component of the California test of legal insanity. (See, e.g., *People* v. *McCarthy* (1896) 115 Cal. 255, 263 [46 P. 1073], approving as a correct statement of the law an instruction that insanity did not encompass moral perversion of a defendant who knew that "the deed is a criminal act, and wrong in itself"; *People* v. *Gilberg, supra,* 197 Cal. 306, 314, rejecting moral perversion as an acceptable test because a defendant might commit serious crimes "and know at the time that the deed is a criminal act, and wrong in itself," and yet escape punishment.) Thus, although it has long been held that "moral insanity," arising from a "perverted" moral sense and brought on by mental illness, is not legal insanity (see *People* v. *Nash* (1959) 52 Cal.2d 36, 45 [338 P.2d 416]; *People* v. *Kerrigan* (1887) 73 Cal. 222, 224 [14 P. 849]), our cases repeatedly distinguish awareness that an act is "wrong" from knowledge of its legal effect, i.e., that it is unlawful. (See *People* v. *Wolff, supra,* 61 Cal.2d 795, 801; *People* v. *Coleman, supra,* 20 Cal.2d 399, 409; *People* v. *French* (1939) 12 Cal.2d 720, 730 [87 P.2d 1014]; *People* v. *Sloper, supra,* 198 Cal. 238, 245; *People* v. *Willard* (1907) 150 Cal. 543, 554 [89 P. 124]; *People* v. *Kerrigan, supra,* 73 Cal. 222, 225 ["If the defendant had sufficient mental capacity to appreciate the nature of her act; if she knew and understood that she was violating the rights of another by an act which was in itself wrong, and which was prohibited by the law, and the commission of which would entail punishment upon herself,—. . . she is responsible to the law . . . regardless of any perversion of the moral senses, however, great . . ."].)

The rule that a defendant must know what he is doing is "wrong and criminal" has been recognized as the accepted formulation "since the first decision in this state (*People* v. *M'Donell,* 47 Cal. 134) and has been followed consistently. . . ." (*People* v. *Daughterty* (1953) 40 Cal.2d 876, 893-894 [256 P.2d 911], noting that the rule had been approved again in *People*

v. *Wells, supra,* 33 Cal.2d 330, 349-350.) Affirming the judgment in *People* v. *Rittger* (1960) 54 Cal.2d 720, 734 [7 Cal.Rptr. 901, 355 P.2d 645], we applied this test and concluded that the expert testimony could be understood as meaning that the defendant did recognize that "his conduct did not accord with social standards of right and legal standards of justification." (See also *People* v. *Sloper* (1926) 198 Cal. 238, 248 [244 P. 362]; *People* v. *Koehn, supra,* 207 Cal. 605, 612; *People* v. *Reid, supra,* 193 Cal. 491, 496; *People* v. *Bundy, supra,* 168 Cal. 777, 779.)

The applicability of the insanity defense to a person whose mental illness is the cause of an insane delusion such as that suffered by defendant, if that delusion rendered him incapable of appreciating that his act was wrong, was made clear in *People* v. *Hubert* (1897) 119 Cal. 216 [51 P. 329]. There the trial court had instructed that "defendant 'was laboring under insane delusions which so permeated his reason as to incapacitate him from knowing the difference between right and wrong, as to the acts charged in the information, and his relations with the deceased, and her actions, motives, and intentions toward him, and that he acted in pursuance of such delusions.'" (119 Cal. at p. 220.) Although we concluded that the court had erred in this and other instructions on insanity which took from the jury the factual issues as to the existence of the delusions, no question was raised as to the applicability of the M'Naghten insanity test to insane delusions which render the individual incapable of appreciating the wrongfulness of his conduct.[13]

This understanding of the M'Naghten test was further affirmed in *People* v. *Willard, supra,* 150 Cal. 543, 554, where this court explained: "That insanity may be available as a defense to a crime charged, it must appear that the defendant, when the act was committed, was so deranged and diseased mentally that he was not conscious of the wrongful nature of the act

---

[13]Application of the M'Naghten test to this type of mental illness was anticipated by the judges who first formulated the test. In response to the fourth question posed by the House of Lords—"If a person, under an insane delusion as to existing facts, commits an offense in consequence thereof, is he thereby excused?"—the judges replied: "[T]he answer must of course depend on the nature of the delusion: but, making the same assumption as we did before, namely that he labors under such partial delusion only, and is not in other respects insane, we think he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real. For example, if under the influence of his delusion he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence, he would be exempt from punishment. If his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment." (*M'Naghten's Case, supra,* 10 Clark & Fin. 200, 211 [8 Eng. Rep. 718, 723].)

This response applies the right/wrong prong of the M'Naghten test to an insane delusion in the same manner as it is applied to other forms of insanity. The delusion first suggested by the judges results in an inability to appreciate that the act is wrong. The defendant believes he is defending himself. The second delusion, without more, does not suggest that the defendant believes his act is lawful or morally justified.

committed. If he has reasoning capacity sufficient to distinguish between right and wrong as to the particular act he is doing, knowledge and consciousness that what he is doing is wrong and criminal and will subject him to punishment, he must be held responsible for his conduct. Although he may be labouring under partial insanity,—as, for instance, suffering from some insane delusion or hallucination,—still if he understands the nature and character of his action and its consequences,—if he has knowledge that it is wrong and criminal, and that if he does the act he will do wrong, such partial insanity or the existence of such delusion or hallucination is not sufficient to relieve him from responsibility for his criminal acts."

Our appreciation of the nature of mental illness has developed greatly since *Hubert* and *Willard* were decided, and the medical community now characterizes some delusional mental illness such as that suffered by defendant as a "schizophrenic disorder,"[14] rather than "monomania" or "partial insanity." The rule expressed in these cases has not changed, however. If the mental illness is manifested in delusions which render the individual incapable either of knowing the nature and character of his act, or of understanding that it is wrong, he is legally insane under the California formulation of the M'Naghten test.

Respondent cites no decisional authority of this state for the argument that the right/wrong prong of the California M'Naghten test of insanity does not encompass awareness, or lack thereof, that the defendant's act was inherently, or morally wrong. Reliance is placed instead on a single out-of-state case, *Chase* v. *State* (Alaska 1962) 369 P.2d 997, 1003, overruled on another point in *Fields* v. *State* (Alaska 1971) 487 P.2d 831, 836 [65 A.L.R.3d 680]. Manifestly, we cannot infer that a 20-year-old decision of the Alaska Supreme Court prompted the drafters of Proposition 8 to believe that the law of California required "clarification."[15] The decision in that case in no

---

[14]American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) pages 181-193.

[15]We do not find the reasoning of *Chase* persuasive. The court concluded that if the two prongs of the M'Naghten test were disjunctive, "the intellect must be divided into two distinct parts. One part would be rational, so that the nature and quality of the act would be understood; and the other part would be irrational, so there could be no understanding that the act was one generally condemned by the community and therefore wrongful. The apparent implication here would be that one mind could be simultaneously normal and abnormal, sane and insane. That this could be is not supported by established medical or psychiatric principles. . . ."

At least two problems appear in this analysis. First, we recognized even before *Chase* that the test of sanity under the M'Naghten formulation is a legal test that does not encompass all of the mental conditions which the medical and psychiatric community recognize as mental disorders. (See *People* v. *Nash, supra,* 52 Cal.2d 36, 48; see also *People* v. *Drew, supra,* 22 Cal.3d 333, 341-342.) Therefore, there is no inconsistency in recognizing that a person who is legally insane may nonetheless have the mental capacity to understand and

way supports a conclusion that the electorate believed such clarification to be necessary or understood the test of legal insanity to be established by section 25(b) would permit a defendant to be found sane who because of mental illness believed that God commanded and expected him to kill another human being and that therefore the killing was morally justified and was not "wrong."

Courts in a number of jurisdictions which have considered the question have come to the conclusion as we do, that a defendant who is incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful. (See, e.g., *People* v. *Wood* (1962) 12 N.Y.2d 69, 76 [236 N.Y.S.2d 44, 187 N.E.2d 116]; *People* v. *Schmidt* (1915) 216 N.Y. 324, 338-340 [110 N.E. 945]; *State* v. *Kirkham* (1958) 7 Utah 2d 108, 110 [319 P.2d 859]; cf. *State* v. *Allen* (1957) 231 S.C. 391, 398 [98 S.Ed.2d 826]; *State* v. *Carrigan* (1919) 93 N.J.L. 268, 273 [108 A. 315].) Justice Cardozo, in an opinion for the New York Court of Appeal, eloquently expressed the underlying philosophy: "In the light of all these precedents, it is impossible, we think, to say that there is any decisive adjudication which limits the word 'wrong' in the statutory definition to legal as opposed to moral wrong. . . . The interpretation placed upon the statute by the trial judge may be tested by its consequences. A mother kills her infant child to whom she has been devotedly attached. She knows the nature and quality of the act; she knows that the law condemns it; but she is inspired by an insane delusion that God has appeared to her and ordained the sacrifice. *It seems a mockery to say that, within the meaning of the statute, she knows that the act is wrong.* If the definition propounded by the trial judge is right, it would be the duty of a jury to hold her responsible for the crime. We find nothing either in the history of the rule, or in its reason or purpose, or in judicial exposition of its meaning, to justify a conclusion so abhorrent. . . . [¶] Knowledge that an act is forbidden by law

---

appreciate the nature of the physical acts he is performing. Further, as the evidence in this case suggests, it is not uncommon that a person who suffers from one of the various forms of mental illness falling within the category of schizophrenic disorders fully understands the nature and quality of his act, but is unable to appreciate its wrongfulness. One expert, addressing this question in his testimony, explained: "[t]he act in this particular case is a strangulation and so the—the appreciation that a person would have to have is that a strangulation could result in death or great bodily harm. The defendant indicated to me in no uncertain terms that he executed this act with the intent of doing great bodily harm, believing of course that he had a right to do but that was his purpose; that was in fact his intent. He admits to that in no uncertain terms.

"Furthermore, in general, the nature of paranoid schizophrenia is that it does not interfere with the people's cognitive abilities; that is to say, those abilities that relate to the possession of mere knowledge, like the knowledge that strangling someone could kill them is not one of the capacities that is negated by paranoid schizophrenia . . . .

"With regard to the nature of the act, . . . he knew that he was holding a cord; he knew that what was holding the cord was his hands, what the cord was wrapped around was a neck, that was the neck of a human being."

will in most cases permit the inference of knowledge that, according to the accepted standards of mankind, it is also condemned as an offense against good morals. Obedience to the law is itself a moral duty. If, however, there is an insane delusion that God has appeared to the defendant and ordained the commission of a crime, we think it cannot be said of the offender that he knows the act to be wrong." (*People* v. *Schmidt* (1915) 216 N.Y. 324, 338-340 [110 N.E. 945, 949-950], italics added.)[16]

The trial court found, on clearly sufficient evidence, that defendant could not distinguish right and wrong with regard to his act. No further hearing on the issue of sanity at the time of the act is required. The judgment is reversed and the superior court is directed to enter a judgment of not guilty by reason of insanity and to proceed thereafter pursuant to section 1026.

Kaus, J., Broussard, J., Reynoso, J., and Lucas, J., concurred.

**MOSK, J.**—I concur in the excellent analysis of the majority. I write only to relate some relevant background. As Oliver Wendell Holmes observed, "a page of history is worth a volume of logic." (*New York Trust Co.* v. *Eisner* (1921) 256 U.S. 345, 349 [65 L.Ed. 963, 983, 41 S.Ct. 506, 16 A.L.R. 660].)

In 1973 I wrote a separate opinion in *People* v. *Kelly* (1973) 10 Cal.3d 565, 578 [111 Cal.Rptr. 171, 516 P.2d 875], urging that the M'Naughton test[1] be "disavow[ed] as outmoded and unsupportable in either medical science or law," and that pending *legislative* action the American Law Institute formulation be adopted by trial courts as the test for insanity. (ALI Model Pen. Code, § 4.01.) At that time six states had adopted the ALI formulation, as had every federal circuit but one. (*Id.* at p. 582.)

Within five years a majority of this court had come around to my view in *Kelly* and judicially adopted the ALI test in *People* v. *Drew* (1978) 22

---

[16]Justice Cardozo's opinion continued: "It is not enough, to relieve from criminal liability, that the prisoner is morally depraved [citation]. It is not enough that he has views of right and wrong at variance with those that find expression in the law. The variance must have its origin in some disease of the mind [citation]. The anarchist is not at liberty to break the law because he reasons that all government is wrong. The devotee of a religious cult that enjoins polygamy or human sacrifice as a duty is not thereby relieved from responsibility before the law [citations]. In such cases the belief, however false according to our own standards, is not the product of disease. Cases will doubtless arise where criminals will take shelter behind a professed belief that their crime was ordained by God, just as this defendant attempted to shelter himself behind that belief. We can safely leave such fabrications to the common sense of juries." (*Schmidt, supra,* 216 N.Y. at p. 340 [110 N.E. at pp. 949-950].)

[1]The majority spell the test *M'Naghten.* All the members of this court spelled it *M'Naughton* in *Kelly,* although I there noted the numerous variants of the spelling. (*Ibid.,* fn. 1.) In the interests of clarity and consistency I believe we should adhere to the spelling we used in *Kelly.*

Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318]. Despite my invitation in *Kelly* the Legislature had not taken any action, and it did not do so after *Drew*. I can only surmise that the legislators' disinterest was born of the belief that the test of insanity was a judicial problem, since the M'Naughton test had originally been court-created.

Just as trial courts, prosecutors and defense counsel were achieving a reasonable détente with *Drew,* the initiative measure known as Proposition 8 was prepared and submitted to the electorate. It contained the latent ambiguity discussed in the majority opinion. Therein lies one of the problems inherent in attempting to adopt rules of evidence and arcane principles of law by popular vote. It is somewhat comparable to the public deciding by popular vote the appropriate technique for surgeons to employ in brain surgery.

I am convinced that the use of "and" instead of "or" would have been discovered in the traditional legislative process. In an assembly committee, on the floor of the assembly, in a senate committee, on the floor of the senate, in the Governor's veto opportunity, such inadvertence would likely have been detected, or if the choice of words was deliberate, such intent would have been clearly declared. In an initiative measure, however, no revision opportunity is possible and no legislative intent is available; the voter has only the choice of an enigmatic all or nothing.

In this instance the choice given voters was encumbered by at least 12 subjects subsumed within what was titled Proposition 8. The numerous subjects were itemized by the Attorney General in his prepared title for submission to the voters and he concluded with a catchall, "and other matters." I remain convinced that Proposition 8 was invalid as a clear violation of the constitutional prohibition against multiple subjects. (Cal. Const., art. II, § 8, subd. (d); see my conc. & dis. opn. in *Brosnahan* v. *Eu* (1982) 31 Cal.3d 1, 6 [181 Cal.Rptr. 100, 641 P.2d 200].) For example, it would appear impossible to rationalize, as but one subject, a return to the M'Naughton rule of insanity and a guarantee of school safety. Regrettably, by a four-to-three majority, my colleagues expediently failed to invalidate the initiative. Had they done so, much of the subsequent uncertainties and incongruities in the criminal law would have been avoided.

Since I am bound by stare decisis to accept that untoward result, I must now join in undertaking the often thankless task of trying to inject some rational meaning into the numerous disparate subjects covered by Proposition 8. The clumsy effort to "return to M'Naughton" is but the latest controversy.

The analysis of the majority being as reasonable and pragmatic as the circumstances justify, I endorse their opinion.

**BIRD, C. J.,** Dissenting.—In June of 1982, the voters adopted a ballot measure which radically altered the test for criminal insanity in this state. (Pen. Code, § 25, subd. (b), added by Initiative Measure, Primary Elec. June 8, 1982, popularly known as Prop. 8.) I cannot ignore the fact that they adopted language which unambiguously requires the accused to demonstrate that "he or she was incapable of knowing or understanding the nature and quality of his or her act *and* of distinguishing right from wrong at the time of the commission of the offense." (*Ibid.,* italics added.) There is nothing in the statute, in Proposition 8 as a whole, or in the ballot arguments that implies that the electorate intended "and" to be "or." However unwise that choice, it is not within this court's power to ignore the expression of popular will and rewrite the statute.

Since appellant failed to establish his insanity under the test enunciated in Penal Code section 25, subdivision (b), I cannot join the decision of my brethren.