Filed 3/4/14  P. v. Cockrell CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KENNETH LEROY COCKRELL,<br><br>    Defendant and Appellant. | 2d Crim. No. B241567<br>(Super. Ct. No. F415411)<br>(San Luis Obispo County) |

Kenneth Leroy Cockrell, Jr. appeals from the judgment entered following his conviction of the first degree murder of his wife.  (Pen. Code, §§ 187, subd. (a), 189.)[1] Appellant originally pleaded not guilty and not guilty by reason of insanity.  He later withdrew the not guilty plea and admitted that he had personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)) and had proximately caused the death of a 66-year-old elder.  (§ 368, subd. (b)(3)(A).)  A court trial was conducted on appellant's plea of not guilty by reason of insanity.  The court found that appellant was sane at the time of the commission of the crime.  Appellant, who is presently 70 years old, was sentenced to prison for 26 years to life.

Appellant contends that the trial court applied an erroneous standard of insanity and that "the evidence contrary to the trial court's finding that appellant was sane was of

---

[1] All statutory references are to the Penal Code unless otherwise stated.

such weight and character, that the trial court could not reasonably have rejected it."  We affirm.

<em>Facts</em>

Appellant "was a very religious person."  He was married to Margaret L., the grandmother of Michael L.  Appellant was Michael L.'s step-grandfather.   In 2006 when Michael L. was 16 years old, he told his grandmother and appellant that he was gay.  Appellant became very angry.  Michael L. testified that appellant had said "it was a sin, that I was going to go to hell, I'll never live a normal life."  Michael L. and appellant argued for more than two hours.  After the argument, Michael L. saw appellant "only a few times."  When they met, they did not talk to each other.  "We pretended like we didn't exist."  Michael L. kept in regular contact with his grandmother.

On Easter Sunday, March 23, 2008, appellant killed his wife (Margaret L.) by hitting her in the head with a hammer while she was sleeping.  Afterwards, appellant went to the police station and said that he had killed his wife.  The police found wife's body lying on a bed inside the master bedroom of appellant's home.  She "had a massive head injury and there was blood all over the bed."  The police had to force entry into the master bedroom because the bedroom door was locked.  Appellant had locked the door after the killing.

The following day, Officer Matt Aanerud interviewed appellant.  Appellant said that his step-grandson, Michael L., was "trying to introduce homosexual doctrine."  Appellant hoped that by killing his wife, he would cure Michael of his homosexuality and cure "society" as well.  Officer Aanerud asked:  "This happened because you're trying to cure not only Michael but other people that are like him also and by doing that you had to kill your wife so

 that . . . they could see how serious you are.  Is . . . that correct?"  Appellant replied: "Yes.  That it's serious, not only how serious I am but how serious it is."  Officer Aanerud inquired,  "Is there anything else that you can think of that would help me understand what happened . . . yesterday?"  Appellant answered:  "I don't think I could put any more understanding to it."  Officer Annerud asked:  "What would God ask you to do?"

2

Appellant responded; "That's a good question." Appellant did not mention anything about hearing voices. Nor did he say that God had commanded him to kill his wife.

*Expert Testimony*

One psychiatrist and three psychologists testified for appellant. Dr. David Fennell, the psychiatrist, testified that appellant had said he heard "a voice . . . stating the words, 'kill Peggy,' referring to his wife." The voice " 'was like voodoo dolls.' " For several days appellant struggled to resist the voice. Finally, he " 'gave into it.' " Appellant "mentioned the word 'sacrifice.' "

Dr. Fennel opined that appellant had understood that "killing a human being is a legal wrong," but had been unable to "appreciate the moral rightness and wrongness of his actions." When appellant killed his wife, "he was responding to a higher moral authority . . . ." Dr. Fennel continued: "[T]his is somewhat akin to a biblical story of Abraham when he was going to sacrifice his son, Isaac, that he was going to obey God. . . . As painful as it was to [appellant] personally, because he dearly loved his wife, . . . he needed to obey God's command to do . . . this sacrifice." On the other hand, appellant knew that it was morally wrong to kill because of "the commandment that says, thou shall not kill." Appellant told Dr. Fennel that Michael L.'s homosexuality "really wasn't -- a consideration. It was just something that he was not happy about . . . ."

Dr. Emily Wisniewski concluded that appellant was suffering from a "psychotic disorder." She opined that appellant understood "that what he was doing was legally wrong, but because of his psychotic symptoms he was unable to appreciate that [it was] morally wrong . . . ." "He believed that . . . he had . . . been commanded by God to kill his wife -- a sacrifice." Appellant told Dr. Wisniewski that " 'a blood sacrifice' " would be " 'good for the same purpose that Christ died and was resurrected so all men might know that he's the one we're to obey.' " Appellant " 'thought it was God's will.' "

Dr. Brandi Mathews concluded that appellant was suffering from "psychosis." "Psychosis means that an individual has lost touch with reality." Dr. Mathews opined that appellant "did not know or understand that his act was . . . morally wrong" when he killed his wife. On the other hand, he knew that his act was legally wrong. Appellant

told Dr. Mathews that his wife was " 'the best of the best,' " and this was "the reason that he . . . was being called to sacrifice her just as Abraham was called to sacrifice the son that he loved very much."  God had "called for a sacrifice" to test appellant's "faithfulness."  "[H]e believed if he . . . 'sacrificed' the best thing in his life . . . that that would be the ultimate sacrifice and that, in turn, would make the world better or make him better."  Appellant stated that Michael L.'s homosexuality "was not a major factor in his thinking at the time."

Dr. Carolyn Murphy testified that appellant had told her that, by killing his wife, he was trying to "cleanse [her] of her sins" and "ensure that she would get to heaven safely."  Dr. Murphy opined that appellant "did not know that what he was doing was morally wrong."

Dr. Kris Mohnadie, a psychologist, testified for the People.  She concluded that, when appellant killed his wife, he was suffering from a "psychotic disorder not otherwise specified."  The "not otherwise specified" language "means it doesn't really fit neatly into any category."  The disorder was "not so extreme that he [was] significantly impaired."  She noted that appellant "has been very functional in his life and has no significant history" of mental illness.

Dr. Mohnadie opined that, despite appellant's mental disorder, he appreciated that it was morally wrong to kill his wife.  One of the factors she considered was appellant's statement that, immediately before the killing, he "was having a back and forth internal debate" about whether he should kill his wife.  Appellant was saying to himself, "[T]hou shalt not kill, kill Peggy."  Dr. Mohnadie continued: "So up until the moment he goes in there [the bedroom] he's having this debate.  He's consulting the Bible.  He's fighting these different parts of himself, . . . he is very much involved in questioning of what he's doing on a moral level at that point in time.  And I think that is very strong evidence of moral capability and that he was not incapable."  Dr. Mohnadie also took into account appellant's statement that at the time of the killing he recognized that "others would think it was wrong."  In addition, Dr. Mohnadie noted that after the killing appellant locked the bedroom door because "[h]e didn't want other people to be traumatized by [the killing.]"

4

The other people included his step-daughter, who was residing in the family home. The act of locking the door showed an "active conscience."

*Trial Court's Decision*

The trial court concluded that appellant had not proved by a preponderance of the evidence that he was insane at the time of the killing. The court discredited the testimony of appellant's experts that he heard voices telling him to kill his wife and that he believed God had commanded him to kill her. The court noted that, when appellant was interviewed by the police the day after the killing, he never mentioned hearing voices or doing God's will. From appellant's "standpoint," the court stated, at "best . . . the evidence would lead to an inference . . . that his delusion was that killing Peggy would cure Michael." "But his distorted delusion to cure Michael cannot support . . . that he was . . . incapable of discerning right from wrong." The court considered it important that, before appellant entered the bedroom to kill his wife, he was "weighing the rightness and wrongness" of his course of action.

*Insanity Rules*

To establish the defense of insanity, the defendant must prove "by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act [or] of distinguishing right from wrong at the time of the commission of the offense." (*People v. Skinner* (1985) 39 Cal.3d 765, 768-769; § 25, subd. (b).) "The relevant inquiry regarding sanity is whether the defendant was *incapable* of distinguishing right from wrong, that is, of realizing that his crimes were morally wrong." (*People v. Kelly* (1992) 1 Cal.4th 495, 535.) "[A] defendant who is incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful. [Citations.]" (*People v. Skinner*, *supra*, 39 Cal.3d at p. 783.) This standard of insanity does not "permit a defendant to be found sane who because of mental illness believed that God commanded and expected him to kill another human being and that therefore the killing was morally justified and was not 'wrong.' " (***Ibid***.)

5

*The Trial Court Did Not Apply an Erroneous Standard of Insanity*

Appellant contends that the trial court applied an erroneous standard of insanity: "Under the trial court's reasoning, a person is not incapable of distinguishing right from wrong if, after an effort to distinguish right from wrong, the person chooses erroneously." Appellant is referring to the court's consideration of appellant's "weighing the rightness and wrongness" of his course of action before entering the bedroom to kill his wife. The court was entitled to consider this factor in determining whether appellant was incapable of distinguishing right from wrong. Its consideration of the factor does not establish that the court found that the mere act of "weighing the rightness and wrongness" conclusively established appellant's sanity.

Appellant also contends that the trial court erroneously concluded that his belief that the killing was "justified by a higher good . . . precluded a finding of insanity." This contention is based on the court's statement that appellant's "distorted delusion to cure Michael cannot support . . . that he was . . . incapable of discerning right from wrong." We do not construe the court's statement to mean that appellant's "delusion to cure Michael" precluded a finding of insanity. We construe it to mean that, without more, appellant's delusion was insufficient to prove by a preponderance of the evidence that he was incapable of distinguishing right from wrong. A reasonable court could reach this conclusion.

*The Trial Court Reasonably Rejected Appellant's Evidence*

Appellant argues that "the evidence contrary to the trial court's finding that appellant was sane was of such weight and character, that the trial court could not reasonably have rejected it." The evidence, contrary to the sanity finding, consisted of testimony that appellant was hearing voices telling him to kill his wife and that he believed God had commanded him to "sacrifice" her. The trial court reasonably rejected this testimony. During the police interview the day after the killing, appellant said that he had killed his wife to cure Michael L. of his homosexuality. Appellant mentioned nothing about hearing voices or following God's command. In reply to Aanerud's

inquiry: "What would God ask you to do," appellant responded, "That's a good question."

The trial court's finding of sanity is sufficiently supported by Dr. Mohnadie's testimony that appellant knew it was morally wrong to kill his wife. Even if Dr. Mohnadie had not testified, the trial court could have reasonably concluded that appellant had not carried his burden of proof because the expert testimony was not credible. "Defendant . . . has the burden of proof on the issue of insanity; if neither party presents credible evidence on that issue the jury must find him sane." (*People v. Drew* (1978) 22 Cal.3d 333, 351, superseded by statute on another ground as stated in *People v. Skinner*, *supra*, 39 Cal.3d at pp. 768-769.)

*Disposition*

The judgment is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.


We concur:



GILBERT, P.J.



PERREN, J.

7

Barry T. LaBarbera, Judge

Superior Court County of San Luis Obispo

_____


Jean Matulis, under appointment by the Court of Appeal, for Appellant.


Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, David E. Madeo, Deputy Attorney General, for Plaintiff and Respondent.