Reuben McDANIEL, Joe P. Martin, Eileen Herrala, Joseph Guenther, Henry Moser, Plaintiffs-Appellees,

v.

The NATIONAL SHOPMEN PENSION FUND, A.S. Goodwin, Samuel Spadea, Dennis R. Tooney, Richard Smith, W.J. Muse, John Doe, Defendants-Appellants.

No. 85–4207.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 1987.

Decided May 21, 1987.

---

Gill Deford, Los Angeles, Cal., for the plaintiffs-appellees.

Thomas J. Hart, Washington, D.C., for the defendants-appellants.

Before WALLACE, FLETCHER and BRUNETTI, Circuit Judges.

WALLACE, Circuit Judge:

The National Shopmen Pension Fund (the Fund) and its trustees appeal the district court's order granting summary judgment in favor of McDaniel and a class of beneficiaries of the Fund (McDaniel). The district court, which had jurisdiction pursuant to 29 U.S.C. § 1132(e)(1), held that the Fund's trustees unreasonably interpreted a provision of the National Shopmen Pension Plan (the Plan) to permit the trustees to reduce McDaniel's benefits. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

I

In 1971, Fentron Industries, Inc. (Fentron) began to make contributions to the Fund, in accordance with the Plan, for the benefit of Fentron's employees. Under the Plan, a retiring or disabled employee receives a pension calculated on the basis of two variables: (1) the contribution rate of the employer, and (2) the number of years of employment credited to the employee. The contribution rate multiplied by the number of years of employment multiplied by a constant yields the amount of the employee's monthly pension. Initially, Fentron contributed $0.20 per hour of employee time. Fentron increased its contribution rate to $0.25 per hour in 1974 and then to $0.35 per hour in 1975.

In 1977, Fentron ceased contributing to the Fund. The Fund's trustees determined that Fentron's withdrawal from participation caused the Fund to be responsible for roughly $500,000 in unfunded liabilities. These liabilities resulted from the Fund's practice of granting two forms of retroactive benefits. First, the Fund gave "past service credit": credit for an employee's years of service with his employer before the employer began contributing to the Fund. Second, when Fentron increased its contribution rate, the Fund granted pension benefits based upon the higher rate

even though that rate was not in effect for all the years of an employee's service. In the first case, benefits were granted for periods of employment during which no contributions were made. In the second, greater benefit levels were applied to periods during which lesser benefits were actually earned because the employer's contributions were at a lower rate.

Although these retroactive benefits resulted initially in unfunded liabilities, the liabilities ordinarily would have been eliminated over time. The Fund's actuaries calculate the ratios of benefit levels to contribution rates so that any unfunded liabilities are amortized over a 30 to 40 year period of employer contributions. If, however, the employer reduces his participation or withdraws from the Fund before the amortization is completed, an actuarial imbalance arises, leaving the Fund responsible for unfunded liabilities. Fentron's withdrawal created such an imbalance.

To avoid leaving the Fund responsible for unfunded liabilities arising from retroactive pension benefits, the Plan contains two provisions which make the grant of such benefits conditional by reserving to the trustees the power to reduce or eliminate them. The first provision, section 2.09 of the Plan, gives the trustees the power to cancel benefits resulting from the granting of past service credit. Thus, when Fentron withdrew in 1978, the Fund's trustees applied section 2.09 and canceled past service credits of Fentron employees. Fentron and a class of its employees filed suit in 1979 alleging that this action violated the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1381. We heard an appeal from that action in 1982 and held that although section 2.09 was valid on its face, it could not be applied to divest completely employees who had previously been vested. *Fentron Industries, Inc. v. National Shopmen Pension Fund,* 674 F.2d 1300, 1306 (9th Cir.1982) (*Fentron I*). *Cf. Stewart v. National Shopmen Pension Fund,* 730 F.2d 1552, 1556–61 (D.C.Cir.) (interpreting our decision as being limited to a case where complete divestment occurred and holding that section 2.09 could lawfully be used to reduce the benefits resulting from past service credits), *cert. denied,* 469 U.S. 834, 105 S.Ct. 127, 83 L.Ed.2d 68 (1984).

While the appeal in *Fentron I* was pending, the trustees voted to apply the second provision, section 2.10, in the event that we determined that they could not apply section 2.09 in this situation. The trustees did not apply this provision as they had section 2.09 to reduce benefits resulting from past service credits. Rather, they applied section 2.10 to reduce retroactive benefits granted when Fentron increased its contribution rate. Section 2.10 reads as follows:

Section 2.10. Contribution Rate Increases. The Trustees reserve the right to reduce the portion of the pension which is attributable to any increase in the contribution rate which increase was agreed upon subsequent to the original Collective Bargaining Agreement providing for contributions to the Fund in order to preserve an actuarially sound relationship between the contributions anticipated from the particular Employer as a result of said increased contribution rate and the projected benefits to be paid to Participants of the Employer as a result thereof.

McDaniel filed a second suit against the Fund and its trustees alleging that the trustees' use of section 2.10 violated ERISA. On cross-motions for summary judgment, the district court entered judgment in favor of the trustees in their personal capacities. The court, however, concluded that section 2.10 did not authorize the trustees to lower benefit levels in these circumstances. Therefore, the court held that using section 2.10 in this manner violated ERISA § 404, 29 U.S.C. § 1104, and granted partial summary judgment against the Fund. As it was unnecessary for the court to address McDaniel's contentions that section 2.10 also violated ERISA in other respects, a final judgment was entered. We review de novo a district court's entry of summary judgment. *Lojek v. Thomas,* 716 F.2d 675, 677 (9th Cir.1983).

II

■ ERISA requires a plan administrator to "discharge his duties ... in accord-

173

ance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). We will reverse this decision of the administrator of the ERISA plan only if the decision is arbitrary, capricious, or made in bad faith. *Dockray v. Phelps Dodge Corp.*, 801 F.2d 1149, 1152 (9th Cir.1986). A decision is not arbitrary or capricious if it is based on a reasonable interpretation of the plan's terms and was made in good faith. *Id.* Because the district court found that there was no showing that the trustees acted in bad faith, we need only consider the reasonableness of the trustees' interpretation. Absent special circumstances, we should defer to an administrator's reasonable resolution of any ambiguities in the plan's language. *Id.* Therefore, the direct question we face is not whether we believe section 2.10 applies in these circumstances, but instead whether the trustees have adopted a reasonable interpretation of that provision.

### A.

We begin our analysis of section 2.10 with its plain language because the best indication of what words mean is what they say. McDaniel contends that reading the provision for its ordinary meaning shows that it comes into play only when an actuarial imbalance is "caused" by an increased contribution rate. McDaniel points to certain phrases in section 2.10 which ostensibly demonstrate that a "causal link" is required. The trustees have the power to reduce benefits *"attributable to* any increase in the contribution rate" to preserve an actuarial balance between the employer's anticipated contributions *"as a result of* the said increased contribution rate," and the benefits to be paid *"as a result thereof."* Plan § 2.10 (emphasis added). McDaniel concludes that when an employer increases its contribution rate, the trustees, at that time and at that time only, can apply section 2.10 to reduce benefit levels to assure an actuarial balance. Because of this causation requirement, McDaniel contends, section 2.10 cannot be applied in any other circumstance. Specifically, McDaniel argues that the trustees cannot use the provision to resolve actuarial imbalances "caused" by an employer's subsequent withdrawal from the Plan.

McDaniel's reading of section 2.10 is logical and highly persuasive. The issue, however, is not whether this reading is the most plausible, but whether the trustees' interpretation is unreasonable.

The trustees also recognize that section 2.10's language requires a causal connection between a contribution rate increase and an actuarial imbalance. But the trustees interpret the provision as requiring a different sort of causal connection. They emphasize the portion of the language in section 2.10 which gives the trustees the power to reduce retroactive benefits "attributable to any increase in the contribution rate." *Id.* From this language they conclude that a causal connection exists if the increased contribution rate is a "but for" cause or cause-in-fact of the imbalance. As the trustees interpret the provision, the required causal link is present in this case. The actuarial imbalance would not have occurred but for the benefits granted retroactively when Fentron increased its contribution rate.

The trustees thus agree with McDaniel that section 2.10 is not a "catch-all" provision permitting the trustees to solve any and all actuarial imbalances by reducing benefits. The provision can only be used to reduce benefits granted retroactively as a result of a contribution rate increase. The trustees disagree, however, that section 2.10 requires action immediately upon payment increase. Indeed, in one respect, the language of section 2.10 can be reasonably interpreted as having an open-ended aspect. It allows benefit reductions "in order to preserve" an actuarial balance.

■ The plain language, therefore, does not indicate whether section 2.10 is triggered only when some stronger form of causal link, such as "proximate" causation, exists between a contribution rate increase and an actuarial imbalance. In this regard, the provision is ambiguous and we must resolve the ambiguity in favor of the trustees' interpretation if it is reasonable. Section 2.10 can reasonably be interpreted to

permit the trustees to adjust benefits whenever a later event, such as an employer's withdrawal, undermines the funding for benefits that were granted retroactively as a result of a contribution rate increase. We conclude, therefore, that the plain language of the provision is ambiguous and that the trustees have chosen one reasonable way to interpret that ambiguity.

### B.

McDaniel argues, however, that the trustees' interpretation of the ambiguity is precluded if we examine section 2.10 in the context of the Plan as a whole. McDaniel points out that section 2.09 gives the trustees the power to take action "if an Employer's participation in the Fund ... terminates." Specifically, the trustees have the power to reduce benefits resulting from the practice of giving credit for past service. McDaniel argues that the structure of the Plan as a whole shows that section 2.09, not section 2.10, grants the trustees the power to respond to an employer's withdrawal.

This view is strengthened, McDaniel claims, if one examines the 1969 version of the Plan. What is now section 2.10 was, in 1969, contained in article II section 7 of the Plan. (We will refer to this provision as "old section 2.10.") Furthermore, a provision corresponding to section 2.09 was found in article II section 6 ("old section 2.09"). The language in new section 2.10 is identical in all material respects to the language in old section 2.10. New section 2.09, however, is not identical to old section 2.09. The old provision gave the trustees the power, in the event of an employer's withdrawal, to cure an actuarial imbalance by reducing benefits without regard to the origin of the benefits. Given the broad reach of old section 2.09, it seems reasonable to infer, as McDaniel does, that old section 2.10 was intended to deal only with the immediate consequences of a contribution rate increase, and not with actuarial imbalances occasioned by subsequent employer withdrawals. McDaniel concludes that because the language of new section 2.10 tracks the language of the old section,

the new section must have the same meaning as the old and therefore likewise does not extend to employer withdrawals.

McDaniel's explanation of the structure and history of the Plan is plausible. Of necessity, however, it would leave a gap in the current version of the Plan. Although old section 2.09 gave the trustees the power to reduce all benefits to correct an imbalance resulting from an employer's withdrawal, new section 2.09 is not as broad. The new version only grants the power to reduce benefits arising from past service credits. Under McDaniel's interpretation, the trustees would not have a mechanism for reducing retroactive benefits attributable to contribution rate increases when an employer's subsequent withdrawal leaves liabilities unfunded.

The trustees, on the other hand, argue that the language of new section 2.10 provides them with just such a mechanism. Since the language of new section 2.10 and old section 2.10 is the same, the trustees' contention here logically must mean that they enjoyed similar powers under old section 2.10. Under this interpretation, however, the 1969 version of the Plan would contain a redundancy because it would have given the trustees power to correct imbalances attributable to contribution rate increases under both old section 2.09 and old section 2.10.

The trustees, in interpreting the present version of section 2.10, are thus confronted with the choice of interpreting it so that the 1969 version of the Plan contained a redundancy or so that the present version of the Plan contains a gap. It is at least as inherently reasonable for the trustees now to conclude that there was a redundancy in the old Plan as to conclude that there is a gap in the new one. We cannot say, therefore, that the trustees' interpretation of section 2.10 is not reasonable, even when examined in the context of the old Plan and the Plan's subsequent history.

### C.

McDaniel makes other arguments that deserve only brief attention. He points out that a paragraph in the summary plan de-

scription from the 1969 version of the Plan indicates that benefits may be reduced when contribution rates are increased and when new employers join the Fund. This paragraph, however, does not purport to limit the scope of section 2.10.

McDaniel also points out that, before this case, the trustees had never applied section 2.10 in response to an employer's withdrawal. This fact, however, does not mean that the trustees lacked the power to apply section 2.10 in this manner.

### III

We have scrutinized the plain language of section 2.10, reviewed its history, and examined it in the context of the Plan as a whole. We hold that it was not unreasonable for the trustees to interpret section 2.10 as permitting them to reduce benefits attributable to contribution rate increases in order to cure an actuarial imbalance after an employer withdraws from participation in the Fund. We have not considered, and do not decide, whether the trustees' application of section 2.10 violated ERISA in other respects. Therefore, we remand for further proceedings.

REVERSED AND REMANDED.