859 F.2d 742
 57 USLW 2292, 10 Employee Benefits Ca 1300
 George A. MacDONALD, Plaintiff,
and
Patrick J. Marckesano; Allen B. Wheeler; William J.
Thomas; A. Fletcher Dice, Plaintiffs-Appellants,
v.
PAN AMERICAN WORLD AIRWAYS, INC., Employee Stock Ownership
Plan; Flight Engineers International Association, PAA
Chapter; International Brotherhood of Teamsters,
Chauffeurs, Warehousemen & Helpers; Airline Pilots
Association, et al., Defendants-Appellees.
 No. 87-6240.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 9, 1988.
Decided Oct. 14, 1988.
 
 Lawrence D. Rohlfing, Rohlfing & Donnelly, Santa Fe Springs, Cal., David E. Wulfsberg, Belgum, Wulfsberg, Belgum & Weber, Long Beach, Cal., for plaintiffs-appellants.
 Steven D. Weinstein, Musick, Peeler & Garrett, Los Angeles, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before HUG, ALARCON and KOZINSKI, Circuit Judges.
 HUG, Circuit Judge:
 
 
 1
 The plaintiffs in this class action appeal the district court's decision granting the defendants summary judgment on cross-motions. The plaintiffs seek damages from Pan American World Airways, Inc. ("Pan Am"), the company's employee stock ownership plan, and several members of the plan's Administrative Committee arising from an alleged failure to distribute benefits in accordance with the plan's language. We affirm.
 
 FACTS
 
 2
 In 1981, Pan Am and several of its employee unions executed a wage reduction agreement. Pursuant to this agreement Pan Am created an employee stock ownership plan ("plan") and funded it with $35,000,000 in stock. The plaintiff class includes members of Pan Am unions who participated in the plan until the termination of their employment with the company in 1985.
 
 
 3
 In 1985, Pan Am agreed to sell its Pacific Ocean area routes to United Airlines. The sale became effective in 1986. As part of the deal, some of the Pan Am employees who worked on the conveyed routes were given the option to transfer their employment to United Airlines. They were told by Pan Am's management that if they transferred to United, their plan shares would be distributed to them in the first quarter of 1987. This distribution date was consistent with an ongoing plan policy of distributing plan shares after December 31 of the year in which an employee's tenure at Pan Am ended.
 
 
 4
 In February, 1986, the plan's Administrative Committee received a request for an earlier distribution of plan shares to the Pan Am pilots who had transferred to United, to be made on the last day of the quarter in which they transferred, specifically March 31, 1986. The request was considered by the Committee in March and rejected. This suit was filed in April, 1986, seeking immediate distribution of plan shares, as well as damages. The district court subsequently certified the class comprising members of various unions who were plan participants and transferred to United. The complaint alleged that plan documents require quarterly distributions, contrary to the policy of annual distributions.
 
 
 5
 Plan distributions to class members were made as scheduled under the annual policy, during the first quarter of 1987. The plaintiffs allege that between the date they claim their plan distributions were due and the date they were made, the value of their stock declined $3.625 per share. They seek compensation for this loss.
 
 STANDARD OF REVIEW
 
 6
 We review the district court's entry of summary judgment de novo. McDaniel v. National Shopmen Pension Fund, 817 F.2d 1370, 1372 (9th Cir.1987). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).
 
 ANALYSIS
 
 7
 The parties agree that the plan is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Secs. 1001, et seq. For purposes of ERISA, the plan's administrator is the Administrative Committee. See 29 U.S.C. Sec. 1002(16). The Administrative Committee consists of one representative of Pan Am and one representative of each union that signed the wage reduction agreement. It acts by a majority of its members.
 
 
 8
 It is well-established that on review, we give the decisions of a plan administrator broad deference. E.g., McDaniel, 817 F.2d at 1373; Fielding v. International Harvester Co., 815 F.2d 1254, 1256 (9th Cir.1987); Jung v. FMC Corp., 755 F.2d 708, 710-711 (9th Cir.1985). We will reverse a decision of the plan administrator only "if the decision is arbitrary, capricious, or made in bad faith." McDaniel, 817 F.2d at 1373. "A decision is not arbitrary or capricious if it is based on a reasonable interpretation of the plan's terms and was made in good faith." Id. Under certain circumstances, less deference is due a plan administrator's decisions--for example, where denial of benefits avoids a substantial outlay or an employer administers its own plan. Jung, 755 F.2d at 711-12; Fielding, 815 F.2d at 1256. However, such circumstances are absent here. Moreover, the decision at issue determined neither eligibility for nor the amount of benefits. It merely determined when benefits would be distributed.
 
 
 9
 "To some extent, this degree of deference derives from trust law rules reflecting the presupposition that trustees have no pecuniary interest in their own decisions." Fielding, 815 F.2d at 1256. This presupposition is manifestly the case here. Therefore, our inquiry is not into whose interpretation of plan documents is most persuasive, but whether the plan administrator's interpretation is unreasonable. McDaniel, 817 F.2d at 1373.
 
 
 10
 Our inquiry begins with the plain language of the plan. The "distribution date" that is material here is defined as "The Valuation Date coincident with or next following ... the date of ... termination." The source of the dispute is the definition of Valuation Date: "The last day of each calendar quarter and, as the Administrative Committee elects, any other day of the Plan Year."
 
 
 11
 The Administrative Committee understood this language to mean that it "was empowered to elect between 'the last day of each calendar quarter' and 'any other day of the Plan Year.' " Consequently, the Committee decided on an annual distribution policy under which a plan participant whose employment with Pan Am ended would receive a distribution after December 31 of the year of termination. The minutes of the Committee's meeting of May 10, 1983 reflect this decision, as does the plan summary sent to participants. The plaintiffs offer no evidence that the policy was ever different.
 
 
 12
 Under our limited review of the Administrative Committee's interpretation, we cannot say that the interpretation is an unreasonable reading of the plan's terms. It may not be the one we would choose, or the most convincing one, but our inquiry does not extend that far. Thus, we disagree with the plaintiff's contention that the Committee failed to administer the plan "in accordance with the documents and instruments governing the plan" as required by 29 U.S.C. Sec. 1104(a)(1)(D).
 
 
 13
 The reasonableness of the Administrative Committee's interpretation is supported by information before the Committee when the decision was made. Evidence submitted to the district court indicates that the Committee was told that quarterly distributions would have been substantially more expensive and more difficult to administer than annual distributions and possibly unfeasible. A distribution of stock was said to take ten weeks, and a quarter comprises only thirteen weeks. Thus, quarterly distributions could have required activity virtually all year. Moreover, the State Street Bank, which became trustee, indicated that it might decline to be involved if distributions were to be quarterly. The Committee could conclude from this information, reasonably, that the plan language should be interpreted to permit the more feasible and less expensive policy of annual distribution.
 
 
 14
 The plaintiffs point out that the administrative costs are borne by Pan Am and not by the plan. They contend that therefore, the decision, insofar as it was based on cost consideration, was not in the interest of plan participants. However, plan participants' benefits were largely in the form of company stock. Therefore, cost to the company was in effect cost to the participants. Furthermore, ERISA states that "defraying reasonable expenses of administering the plan" is a valid purpose for the exercise of a fiduciary's duty. 29 U.S.C. Sec. 1104(a)(1)(A)(ii) (1982). It follows that plan expenses are a legitimate concern of the Administrative Committee.
 
 
 15
 The plaintiffs also contend that the Administrative Committee's interpretation was made in bad faith. We see no evidence offered that could prove bad faith. There is no evidence of self-dealing, animosity toward the plaintiffs, or company control of the policy decision. Bad faith also tends to be disproved by the consistent application of the policy over time. In addition, even if the plaintiff's contention were true that counsel advised the Committee that formal amendment of the plan was required for an annual distribution policy, disagreement with that advice would not establish bad faith. Finally, the decision was made before the value of Pan Am stock declined--the value could just as well have gone up while the plaintiffs awaited their distributions.
 
 
 16
 We see no merit in the plaintiff's other contentions. Because we agree with the district court that the Administrative Committee's interpretation of plan language was neither unreasonable nor in bad faith, we affirm the district court's grant of the defendants' motion for summary judgment. We do not need to reach the question of whether Pan Am itself and John Kerrigan are proper defendants since they are not liable in any event under our decision.
 
 CONCLUSION
 
 17
 The district court's order is AFFIRMED. Costs are awarded to the defendants. Each side will bear its own attorneys' fees.
 
 
 18
 AFFIRMED.
 
 KOZINSKI, Circuit Judge, dissenting:
 
 19
 I cannot agree that the plan's clear and simple language is reasonably susceptible of the interpretation offered by the defendants. Plain as day, the plan provides that the valuation date shall be on "[t]he last day of each calendar quarter and, as the Administrative Committee elects, any other day of the Plan Year." Pan American World Airways, Inc. Employee Stock Ownership Plan (Pan Am ESOP), at I-4, Excerpts of Record (ER) at 3 (emphasis added). This language is not in the least ambiguous: It can only be interpreted to mean that the Administrative Committee has the authority to select valuation dates in addition to the four already provided by the plan. The Administrative Committee has nevertheless taken the position that it may do away with the quarterly valuation dates altogether, and substitute a single valuation date in their stead. I can think of only one way to derive that interpretation from the quoted provision: by substituting the disjunctive "or" for the conjunctive "and." Unlike the majority, I am unable to approve as reasonable an interpretation that requires us to perform such radical surgery on a document's plain language.
 
 
 20
 I see two obstacles barring the majority's conclusion, one linguistic, the other structural. As a linguistic matter, "and" and "or" are not synonyms; indeed, they are more nearly antonyms. One need only start the day with a breakfast of ham or eggs to be duly impressed by the difference. While "and" and "or" are both small words, and are occasionally seen joined with a slash, when they stand alone, they have substantially different meanings with dramatically different effects. We give our language, and our language-dependent legal system, a body blow when we hold that it is reasonable to read "or" for "and." While I don't foreclose the possibility of substituting the two words for each other where it is necessary to avoid a patent absurdity or correct a drafting error, see, e.g. Leff, The Leff Dictionary of Law: A Fragment, 94 yale L.J. 1855, 2021 (1985); People v. Skinner, 39 Cal.3d 765, 775-77, 217 Cal.Rptr. 685, 704 P.2d 752 (1985), I can't agree that the substitution is permissible in ordinary circumstances.
 
 
 21
 Which leads me to my structural objection. Reading the plan's language as written not only does not lead to an absurd result, it leads to a result far more in keeping with the plan's organization and logic. Under the terms of the plan, the Administrative Committee is given discretion to operate and administer the plan on a day-to-day basis; to amend the plan, however, there must be action by the Board of Directors. Pan Am ESOP, at VIII-3, IX-1, ER at 3. Giving the word "and" in the quoted phrase its plain meaning is fully consistent with this scheme: It authorizes the Administrative Committee to add a valuation date if convenient in a given year. For example, the Committee might deem it useful to add a valuation date to coincide with a particular event, such as a stock split or a buyout of Pan Am's stock by another company. Consistent with the Administrative Committee's limited powers, the addition of such a spot valuation date would be effective only momentarily; the plan would return to quarterly valuations in future years.
 
 
 22
 Under the majority's holding, however, the Administrative Committee may permanently do away with quarterly valuation dates. This pro tanto amendment of the plan, effective for years to come, is accomplished without approval of the Board of Directors, neatly circumventing the plan's amendment procedures. Such a departure from the terms of a contract would be disquieting under any circumstances. It is even less acceptable when the contract is an employee benefit plan subject to the protections Congress built into ERISA, including the requirement that such plans be amended only pursuant to procedures carefully delineated in the plan itself. See, e.g., Nachwalter v. Christie, 805 F.2d 956, 960 (11th Cir.1986) (informal written agreements may not be used to modify an ERISA plan). The Administrative Committee's proffered interpretation of the plan allows it to do precisely what the statute prohibits.
 
 
 23
 I can see no justification for approving an interpretation that so clearly runs against the policies of ERISA and the plan's language and logic. The plan was drafted by sophisticated parties who then filed it with the Secretary of Labor pursuant to 29 U.S.C. Sec. 1022(a)(2). After filing the plan, the Administrative Committee had ample time to change the valuation date by presenting an amendment to the Board of Directors. Everyone involved had a lawyer to hold his hand every step of the way. If these parties are not bound by the clear language of legal instruments designed to constrain their conduct, who is? I would reverse and instruct the district court to give plaintiffs the "and" they deserve.