Filed 3/27/14  P. v. Evans CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RICKEY BERNARD EVANS,<br><br>        Defendant and Appellant. | A133304; 133829<br><br>(Contra Costa County<br>Super. Ct. No. 51000439) |

Rickey Bernard Evans appeals from a judgment upon a jury verdict finding him guilty of:  (1) assault on a government official with the intent to prevent the performance of his official duties (Pen. Code,[1] § 217.1, subd. (a)); (2) assault on a peace officer by a force likely to produce great bodily injury (§ 245, subd. (a)(1)); and (3) resisting an executive officer by force and violence (§ 69).  The jury also found true the allegations that he personally used a deadly weapon in the commission of the assault on the government official (§ 122022, subd. (b)(1), that he suffered a prior serious felony (§§ 667, subd. (a)/1192.7), and that he inflicted great bodily injury in the commission of the assault on the peace officer (§ 12022.7, subd. (a)).  He contends that the trial court erred by failing to give the jury a cautionary instruction about the use of restraints.  He also contends the court erroneously instructed the jury on insanity, and that the court erred in its instruction on the burden of proof during the sanity phase of the trial.  We affirm.

---

[1] All further statutory references are to the Penal Code.

1

## I. FACTS

### 1. *Assault on Deputy Public Defender Fleming*

On March 16, 2007, Tom Fleming, a deputy public defender, represented defendant at his arraignment in a felony case. Defendant brought a *Marsden*[2] motion to discharge Fleming. The court conducted a hearing on the motion and denied it, finding that defendant had not shown good cause for removing Fleming from the case. After the hearing, defendant demanded to meet with Fleming and was hostile and angry. Fleming wanted to repair his relationship with defendant so he agreed to meet with defendant at the jail.

Fleming was concerned about defendant's demeanor so he informed the deputy on duty to keep an eye out and monitor the meeting. The interview occurred inside an interview room at the Martinez Detention Facility (MDF). The deputy offered to shackle defendant but Fleming declined because he was concerned about establishing trust with defendant. Hence, Fleming met with defendant in a room without a glass barrier. At the conclusion of the meeting, defendant told Fleming that he was going to go through the A.D.O.'s, meaning the Alternative Defender's Office, and get himself " 'a paid attorney.' " Defendant then stood up, looked out of the room toward the sheriff's station, and picked up a plastic chair and hurled it at Fleming, hitting him in the shoulder. Fleming testified that defendant hurled the chair with such extreme force that "[i]t tattooed an imprint of the bottom of the leg of the chair on my shoulder . . . ." Defendant then rushed Fleming, attacked and punched him in the face and the body and kneed him in the legs. Fleming's glasses were broken in the incident. In addition, Fleming suffered injuries to his left thigh, an abrasion to his right arm, and an injury to his shoulder. Fleming was traumatized by the incident and considered quitting his job. As a result of the incident, Fleming notified the court of a conflict of interest because he could no longer represent defendant since he was now a victim.

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

At the time, Fleming thought that defendant's attack was impulsive, but upon reflection, he opined that it was a planned attack in order to secure the appointment of a new attorney through the conflicts panel.

## 2. *Assault on Deputy Sheriff Perry*

On June 29, 2007, defendant was in his cell in the D-Module of MDF where inmates that have disciplinary problems are housed. Deputy Kenny Hutton was on duty in the security booth. He monitored defendant's disciplinary hearing which was conducted in defendant's cell and which Sergeant Cook and Deputy Anthony Perry attended. The hearing occurred about 1:15 p.m. and defendant was sanctioned. At approximately 2:00 p.m., defendant asked for a "clean sheet"[3] so that he could attend the upcoming Jum'ah prayer service. Hutton told him that he would see what he could do.

Deputy Perry was working as the floor deputy in D-Module on June 29, 2007. After the disciplinary hearing, Perry subsequently returned to defendant's cell to escort him to the Jum'ah prayer service. Defendant asked for a clean sheet but Perry told him, "no." Perry turned and pointed toward the direction he wanted defendant to walk to the prayer service when defendant struck him on the right side of the face with a closed fist. Perry was knocked down to the ground. Defendant straddled him and punched him several times in the face and head. Perry was able to get himself away and get help from Hutton.

Hutton found Perry to be bleeding profusely from his nose, and saw that he had immediate swelling to his right eye and on his face. He was disoriented, and unsteady in his gait. Hutton ordered defendant to get on the ground, but he refused. At some point, Hutton was able to handcuff him. When backup deputies arrived, Hutton and the deputies took defendant to an intake cell where defendant said, "I'm sorry, I'm sorry, I didn't mean to hurt — I didn't mean to hurt that man." Defendant asked Hutton to tell Perry, "Just tell him that I'm sorry."

---

[3] Individuals at the prayer service worship upon a sheet, garment, or rug that is placed on the ground.

Perry was in significant pain and vomiting blood; he was taken to the hospital. His face was fractured in numerous places. He still experiences hypersensitivity in the area below his right eye and in three of his front teeth.

### 3. *Defense*

Defendant testified that during the incident with Perry, he "blanked out" and then apologized to him because he didn't know what was happening. He saw Perry bleeding and said, " 'I fucked up.' " He did not recall being upset with Perry but he felt that not having a sheet would have hindered his prayer service. He did not recall telling jail staff that he was intentionally trying to be found mentally ill so that he could go to the state hospital, but it "sounds possible" that he did.

### 4. *Sanity Phase*

Dr. Edward Hyman, a forensic and clinical psychologist, testified on behalf of defendant. He evaluated defendant using the Minnesota Multiphasic test (MMPI-2) and the Personality Assessment Inventory (PAI-2) and found that defendant had elevated scores reflecting paranoid schizophrenia and depression. His ego strength scale on the MMPI-2 was "abysmally low" indicating someone who is severely depressed and anxious and psychotic.

On the Wechsler Adult Intelligence Scale, Hyman found that defendant scored in the average or high average range for intellectual functioning. On the Rorschach test, defendant's data showed that his interactions with others are often maladaptive and demonstrate very ineffective interpersonal behavior. The data was consistent with someone who is schizophrenic, depressed, and paranoid. The testing also showed that defendant's ability to control his behavior was deficient, and that his ability to cope with stressors was less than normal.

Hyman diagnosed defendant as having a schizo-affective disorder—bipolar type with episodic dyscontrol, chronic and severe. He concluded that defendant did not understand the nature of his act in throwing the chair at Fleming due to his impulsive, episodic dyscontrol. In terms of knowing right from wrong, defendant does not react with reason, but rather in a more impulsive, dyscontrolled fashion. Thus, defendant

4

understood the nature of what he was doing, but not the quality and could not differentiate between right and wrong.

In regards to defendant's assault on Perry, Hyman opined that it was a psychotic episode because defendant had a blackout. Hence, defendant did not know the nature and quality of his act and could not distinguish right from wrong. Hyman did not question that at times defendant can be manipulative but opined that it could be normal manipulation or psychotic manipulation and that it was characteristic of his disorders.

Dr. Andrea Shelley, a forensic psychologist, testified on behalf of the prosecution. She opined that defendant knew the difference between right and wrong and that he could appreciate the quality and nature of his acts; he did not meet the criteria for insanity. With regard to the chair incident involving Fleming, defendant told Shelley that he knew it was wrong and that he might be charged with a crime. He said he threw the chair by his " 'own choice.' " As to the assault on Perry, defendant told Shelley that he had a "blank spot" in his memory until he was standing over Perry who was bleeding. Shelley believed that defendant's statement that he knew he was responsible for the incident and his apology to Perry demonstrated that he knew what he did was wrong. She was highly doubtful that defendant would have suffered a blackout and then come to immediately after the assault. Finally, with regard to psychotic dyscontrol, Shelley opined that rage and loss of control does not amount to the inability to know right from wrong. While Shelley was aware of Hyman's diagnosis, she opined that a person can have a mental illness and still be able to make a decision whether actions are right or wrong.

## II. DISCUSSION

### 1. Restraints instruction

#### a. Background

During jury selection, defense counsel informed the court that defendant believed he was observed by prospective jurors as he was being led across the hallway to the court in shackles. Defendant contended he could not receive a fair trial and moved to discharge the jury. The court remarked that since the courtroom was on the opposite side of the hallway from the tunnel that leads up from the jail, there was a problem preventing jurors

5

from seeing defendants cross the hallway. The court denied defendant's motion, noting that it could voir dire the jury about defendant being in custody and the fact that he was unable to make bail, and give the standard admonishment to the jury that it was not to consider those facts in any way in deciding the case.

After consulting with defendant, defense counsel stated that it would not likely request a jury instruction on the issue. The court then told defendant, "[i]f you change your mind at any time, let me know. I'm happy to admonish the jury, kind of like I did about whether or not you would testify, just to make sure nobody is gonna be, you know, thinking about that in any way as they're deciding the issues in the case, okay?" Defendant responded, "All right." He did not raise the issue during voir dire and did not request an admonition.[4]

During jury instructions, the court raised the issue of a restraints instruction: "The Court has a sua sponte duty to give this instruction if the defendant has been restrained in a manner that is visible to the jury. If restraints are not visible, do not give this instruction, unless requested by the defense. [¶] So, Mr. Siino [defense counsel], are you requesting a restraint instruction?" Defense counsel replied that he was not requesting the instruction. The following colloquy then occurred: "[MS. HENDERSON, deputy district attorney]: But there is some evidence [defendant] is talking about right now that the jurors did see him in the hallway being restrained being transported. [¶] So I think out of an abundance of caution, the Court has a sua sponte duty to give because there is evidence that the defendant being seen — [¶] [THE COURT]: Well, I don't know if restrained is the same as being in custody and being transported to court. I think it's different. [¶] [MS. HENDERSON]: I do too. That's a really good point. [¶] [THE COURT]: I think that they're right. I don't think we should give it. I think being restrained is different. [¶] [MS. HENDERSON]: The People will withdraw their request. [¶] [THE COURT]: Certainly we've put it on the record that if they wanted the

---

[4] Defendant was in restraints during the trial in a "security" chair from which the jury could not see that he was restrained in any way.

instruction because of his transportation they could have asked for it. [¶] [MR. SIINO, defense counsel]: Rickey [defendant], do you want it or not? [¶] [DEFENDANT]: No."

### b. Analysis

Defendant contends that he was denied due process because the court should have admonished or instructed the jury pursuant to CALCRIM No. 204 after it became aware that jurors may have observed him in shackles as he was escorted to the courtroom.

CALCRIM No. 204 provides: "The fact that physical restraints have been placed on [the defendant] is not evidence. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations." The court must instruct the jury pursuant to CALCRIM No. 204 if the jury has observed a defendant in restraints. (*People v. Duran* (1976) 16 Cal.3d 282, 291–292.) "[W]hen the restraints are concealed from the jury's view, this instruction should not be given unless requested by defendant since it might invite initial attention to the restraints and thus create prejudice which would otherwise be avoided." (*Id.* at p. 292.)

Defendant waived the issue of a cautionary instruction on restraints. He not only refused the court's offer to admonish the jury when the issue was first raised, he did not request a restraints instruction and expressly declined one when the issue was discussed during jury instructions. On these facts, defendant cannot now be heard to complain that the trial court should have given the cautionary instruction sua sponte.

In any event, as the *Duran* court recognized, the failure to give a cautionary instruction concerning restraints is not prejudicial when a defendant is seen in restraints for only a brief period outside the courtroom. (*Duran, supra,* 16 Cal.3d at p. 287, fn. 2.) "We note that the case at bar does not involve a situation wherein the defendant was seen in shackles for only a brief period either inside or outside the courtroom by one or more jurors or veniremen. [Citations.] Such brief observations have generally been recognized as not constituting prejudicial error. [Citations.]" (*Ibid.*)

Finally, in *People v. Jacobs* (1989) 210 Cal.App.3d 1135, 1140–1141, the court rejected the identical claim raised by defendant. The court reasoned that the rationale

7

behind the sua sponte instruction requirement was "to alleviate the potential prejudice arising from the need to have visible, physical restraints on a defendant in a courtroom while in the jury's presence." (*Ibid.*) The court determined that the rule was not applicable in the instance when prospective jurors may have viewed the defendant in restraints while he was being taken to or from the courtroom since it is a customary practice to utilize restraints when transporting prisoners and our Supreme Court has recognized that brief observations of a defendant in restraints by one or more jurors or veniremen does not constitute prejudicial error. (*Id.* at p. 1141.) The *Jacobs* court therefore held "that where one or more jurors or veniremen merely witnessed defendant being transported to or from the courtroom in visible restraints the trial court has no duty, sua sponte, to instruct the jury that the physical restraints on defendant have no bearing on the determination of guilt." (*Ibid.*) We agree with the *Jacobs* court. The court did not err in failing to give CALCRIM No. 204 sua sponte.

### 2. *Insanity instruction*

Defendant next contends that the court erroneously instructed on insanity under the new version of CALCRIM No. 3450. He argues that the new version of the instruction misstated California law on the definition of insanity and thus violated his due process rights. We disagree.

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' . . . 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

8

The court gave CALCRIM No. 3450, as revised in October 2010, as follows: "The defendant was legally insane if, one, when he committed the crimes, he had a mental disease or defect. And, two, because of that disease or defect, he was incapable of knowing or understanding the nature and quality of his act. Or was incapable o[f] knowing [or] understanding that [his] act was morally [or] legally wrong."

The instruction was a correct statement of the law. As our Supreme Court stated in *People v. Hernandez* (2000) 22 Cal.4th 512, 520–521, "[i]nsanity, under California law, means that at the time the offense was committed, the defendant was incapable of knowing or understanding the nature of his act or of distinguishing right from wrong. (Pen. Code, § 25, subd. (b); *People v. Skinner* (1985) 39 Cal.3d 765, 776–777 [construing Pen. Code § 25, subd. (a), as providing that defendant may be found insane if he did not know the nature and quality of his act *or* if he did not know the act to be morally wrong].)" Our Supreme Court also explained in *People v. Jablonski* (2006) 37 Cal.4th 774, 830–831 that CALJIC No. 4.00,[5] which similarly defines the insanity defense and also tracks section 25, subdivision (b), is a correct statement of the law.

Defendant acknowledges that the revised version of CALCRIM No. 3450 "parrots" the language of section 25, subdivision (b) but argues that it fails to explain that the phrase, "incapable of knowing or understanding," means that the defendant did not know or understand. He also asserts that the instruction is misleading because it requires the jury to find not only that he did not know or understand his act was morally wrong but also that he was incapable of knowing that it was morally wrong.

We fail to understand the distinction defendant seeks to make. If a defendant is incapable, as a result of mental illness from knowing that his conduct is wrong, he also does not know or understand that his conduct is morally wrong. Regardless, if defendant

---

[5] CALJIC No. 4.00 provides, "A person is legally insane when by reason of mental disease or mental defect [he] was incapable at the time of the commission of the crime of one of the following: [¶] 1. Knowing the nature and quality of [his] act; or [¶] 2. Understanding the nature and quality of [his] act; or [¶] 3. Distinguishing what is legally right from what is legally wrong; or [¶] 4. Distinguishing what is morally right from what is morally wrong. . . ."

believed that the jury was likely to be misled by the instruction's language, it was his responsibility to request clarification or modification of the instructions at trial. (*People v. Carpenter* (1997) 15 Cal.4th 312, 391–392.) We reject defendant's claim of instructional error.

### 3. *Burden of proof instruction*

Defendant also contends that the court's further instruction pursuant to CALCRIM No. 3450 on the burden of proof violated his rights to due process. He argues that the court should have instructed the jury on the preponderance of the evidence standard.

The court instructed the jury in the language of CALCRIM No. 3450 that "[i]f after considering all [the] evidence, all 12 of you conclude that the defendant has proved that it is more likely than not, that he was legally insane when [he] committed the crimes, you must return a verdict of not guilty by reason of insanity." Defendant urges that the instruction was insufficient because the court did not use the phrase, "preponderance of the evidence" and did not define that term.

Again, defendant failed to request a clarification or modification of the court's instructions. "A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.) Even assuming that the issue is cognizable on appeal, it is without merit. The court's instruction correctly set forth the burden of proof required to prove insanity. (See § 25, subd. (b).) And, defense counsel explained the standard in his argument to the jury: "The burden of proof is as Her Honor will instruct you, will [the evidence] tilt the scales, that is the burden[,] a lot less than beyond a reasonable doubt that was given earlier . . . . [¶] Have we tilted the scales for insanity." (See *People v. Garceau* (1993) 6 Cal.4th 140, 189 [parties' closing arguments diminished any possibility that the jury was confused].) The trial court did not err in its instructions to the jury.[6]

---

[6] In light of our resolution of the issues on appeal, we need not address defendant's claim of cumulative error.

10

## III. DISPOSITION

The judgment is affirmed.

_____
Rivera, J.


We concur:


_____
Ruvolo, P.J.


_____
Humes, J.