Filed 4/21/21  P. v. Ware CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES WARE,<br><br>    Defendant and Appellant. | B301990<br><br>(Los Angeles County<br>Super. Ct. No. PA083082-01) |

APPEAL from an order of the Superior Court of Los Angeles County, David B. Gelfound, Judge.  Reversed and remanded with directions.

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.

This is the third time we confront an appeal in this case. (*People v. Ware* (May 30, 2017, B271291) [nonpub. opn.] [reversing the judgment for instructional error and permitting the People to accept a reduction of a criminal threats conviction to an attempted criminal threats conviction]; *People v. Ware* (Feb. 19, 2019, B287995) [nonpub. opn.] [affirming denial of a *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*) motion brought on remand but remanding again to give the trial court the opportunity to consider exercising its discretion to strike two five-year prior serious felony conviction enhancements].) We are now asked to decide whether reversal is required because the trial court declined to decide whether defendant James Ware (defendant) is entitled to retroactive consideration for mental health diversion (see generally *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*)) and whether the trial court abused its discretion when opting not to strike the two sentencing enhancements.

I

A

We have previously summarized much of the history of this case. We reproduce that summary here as pertinent for our purposes.

Early in the morning on February 26, 2015, defendant's mother called 911 to report defendant was causing a disturbance at her house and refusing to leave the property. Defendant left the scene before the responding police officers arrived.

Later that same morning, defendant's brother Rick spoke to defendant by phone and recorded the call without telling defendant he was doing so. Rick placed the call on speakerphone so their mother, who was also in the house, could listen in.

Defendant said he wanted to come over to the house so he could eat, take his diabetes medication, and shower before going to school. Rick refused to give defendant permission to enter the house, explaining it was not his house (it was their mother's) and reminding defendant he would "assault everybody" whenever he came over. Defendant then began arguing with Rick, and Rick repeatedly told defendant he should get counseling or enter a treatment program to address his substance abuse and mental health issues. Defendant eventually hung up on Rick.

When defendant called Rick back, Rick again surreptitiously recorded their conversation. Defendant told Rick he was "so mad" and "really want[ed] that house to burn down." Defendant elaborated, using even more vivid language: "I got a Molotov cocktail right here. I've got a lighter in my hand, Ricky. And—and I—I got a great big old 40-ounce bottle full of gas, and I'm going to burn your house down, man." Rick responded by telling defendant "we really care about you" and "[w]e want you to go to counseling."

Defendant, however, was far from done. Over the next ten-plus minutes, he repeatedly threatened Rick and the other occupants of the house, stating at one point: "I hate you so much that I could really trap with you [sic] motherfuckers in there right now and burn that house down. That's how I'm feeling right now. You know what I mean? But you want to talk to me about a fucking [counseling] program? [¶] . . . [¶] I'm tired of this motherfucking shit. I'm tired. You think I'm going to—the next time I go to jail, I just want you motherfuckers to know, yeah, I deserve that. So whatever life sentence I get or whoever die[s], whatever happen[s], man, you all—you all brought this shit on yourself, man, you know? [¶] . . . [¶] "I want you dead, man. I

3

want your mama dead and your fucking daughter, man, and I'm going to kill you motherfuckers . . . . I'm going to show you motherfuckers what real hate is, you know. [¶] . . . [¶] I don't want to beg. I don't want to—you know what, fuck being, I don't even want to fucking be alive. You know what I mean?" Throughout this portion of defendant's tirade, Rick did not respond to defendant's threats other than to reiterate defendant should enroll in a counseling program and to extol the virtues of such a program, e.g., that a residential program would provide defendant with food and an opportunity for Bible study.

The phone conversation continued. Defendant told Rick he was standing on the roof of the house and could "light all the exits on fire and you motherfuckers won't even be able to get out." Defendant asked Rick, "Do you hear me on the roof, Ricky?" Rick responded, "Nope," and followed up with, "Hey Jamie, the program is going to be great for you." Defendant's retort was to tell Rick his "car is on fire already"; in fact, it wasn't.

Defendant asked to speak to his mother, and she told defendant he should go to school and go to counseling. After defendant continued to protest being kept out of the house and told Rick he "lit your house on fire," Rick responded, "Jamie, this is terrorism." Defendant said he didn't care and told Rick maybe he (defendant) could eat in jail; Rick responded that he thought "it would be better in a program." The conversation ended when Rick indicated he was going to get off the phone and would see defendant after his "little program"; defendant replied, "you have a nice day."

Sometime after the call between defendant and Rick ended, Rick called 911. Rick told the 911 operator his mother asked him to call because defendant had come to the house and damaged a

4

door while trying to break in.  Rick's mother, who also spoke to the 911 operator during the call, explained defendant broke the door frame but couldn't get the door all the way open.  In response to the operator's questions, Rick said defendant was still trying to get in the house and seemed like he was on drugs.  At the end of the call, the operator told Rick and his mother to call back if anything else happened, and the recording ends with Rick's mother saying, "I smell um, I smell."

Rick called 911 again approximately ten minutes later.  He told the operator he thought defendant "just poured gasoline all over, [and] he's trying to burn the house down."  The operator asked, "And you said he put gas all over the house?"  Rick responded, "Y[eah], we have a tape of the thing.  And he did it.  And he burst the door down trying to get in."  Rick then said, "It really smells like gas, or something in here.  But we can't go out because he's out there.  Yea[h], he's coming back and forth across the street from the neighbors house, they're also . . . felons."  The 911 operator told Rick that the police were being sent to his location and the fire department was also being notified.

Rick told responding police officers that defendant broke the door and tried to get in the house.  One of the officers examined the house's side door and found the jamb had been cracked in a way consistent with someone hitting or kicking the door.  During their inspection of the property, the officers could smell gasoline when standing in the area of the home's side door and front door, and a piece of carpet in front of one of the doorways later tested positive for the presence of gasoline.  The responding officers took defendant into custody and found a lighter in his front pocket during a search of his person.

5

B

Before trial, the People offered defendant a plea deal. Under the terms of the proposed agreement, the prosecution would recommend a six-year prison sentence if defendant pled guilty or no contest to the criminal threats charge. Defendant rejected that deal but thereafter agreed to an even more favorable agreement, which the then-presiding trial judge initially approved, that would result in a probationary sentence (by striking both of his prior convictions for serious or violent felonies under the Three Strikes law), with a requirement that defendant enroll in a one-year, live-in "dual diagnosis" program.[1] After defendant expressed what the trial court understood as some reticence about whether he had a drug problem, however, the trial court withdrew its approval of the plea agreement and set the case for trial instead.

Before trial began, defendant placed several phone calls from jail to his mother and Rick. Defendant repeatedly asked Rick to refuse to show up as a witness at trial and to tell the district attorney to drop the case. In one of the calls, defendant asked Rick to "recant this statement" and "help me try to dismiss this case" because the prosecution was "trying to give me life!" Incredulous, Rick told defendant "they" (the prosecution) were

---

[1]     A dual-diagnosis treatment program simultaneously treats mental health and substance abuse issues. (See, e.g., *In re Matthew C.* (2017) 9 Cal.App.5th 1090, 1099.) When discussing the program, defendant asked the court to allow him to use medical marijuana while participating. The court responded: "I'm telling you that while—if you're taking bipolar medication, unless the program says that medical marijuana is part of your regimen, I can't allow it, just so you know."

6

just trying to get defendant to go to treatment.  Defendant told Rick he was wrong and explained the prosecution was not offering treatment but was "trying to give me 25-life."

When it later came time for trial, the prosecution called Rick as a witness and elements of his testimony varied in significant respects from what he testified to at the preliminary hearing.  Rick explained he and his mother refused to let defendant in the house on the day he was arrested because they were practicing "tough love" and wanted him to "hit bottom" so he would get treatment for his psychological and drug issues.  Rick also testified defendant's behavior on the day in question was not unprecedented; defendant had acted the same way and made threats similar to those he made on February 26 "countless" times, especially when he had not eaten or taken his medication.  Rick said he "[did]n't pay attention" to the threats, which were a "normal occurrence" that defendant "constantly" made, "like a broken record."  Rick explained he falsely claimed to have been in fear because he believed that was what he needed to say to get the prosecution to compel defendant to participate in treatment for his drug and mental health problems.

The jury found defendant guilty of making criminal threats but not guilty of attempted arson.  The jury further found defendant had sustained three prior serious or violent felony convictions in 1992, one for voluntary manslaughter and two for assault with a deadly weapon (both of which were sustained in the same criminal proceeding).  The trial court sentenced defendant to a prison term of 35 years to life: 25 years to life for the criminal threats conviction, pursuant to the Three Strikes

7

law (Penal Code sections 667, subdivisions (b)-(i) and 1170.12),[2] plus two consecutive five-year terms under section 667, subdivision (a)(1) for the qualifying prior serious felony convictions.  We later reversed the criminal threats conviction for instructional error and the People accepted a reduction of the conviction to attempted criminal threats.  The trial court, at resentencing in January 2018, made no change in defendant's 35 years to life sentence.

Defendant again appealed, arguing the trial court should have granted his renewed *Romero* motion at resentencing and we should remand to give the trial court the opportunity to strike the section 667, subdivision (a)(1) prior serious felony conviction enhancements pursuant to the intervening change in law implemented by Senate Bill No. 1393 (2017-2018 Reg. Sess.), which gave trial courts additional discretion to strike such enhancements in the interests of justice.  In February 2019, we "remanded for the trial court to consider whether it wishes to exercise its discretion to strike, under section 1385, one or both of defendant's section 667, subdivision (a)(1) enhancements" but affirmed in all other respects.

## C

On remand (the remand from which this appeal arises), defendant asked the court to strike both of his serious prior conviction enhancements pursuant to the discretionary authority conferred by Senate Bill 1393 (and as unconstitutional cruel or unusual punishment).  Defendant argued the enhancements

---

[2]     Undesignated statutory references that follow are to the Penal Code.

8

should be stricken because, among other things, they were remote (27 years old) and because he suffers from "mental illness issues."

In addition to his request to strike the prior serious felony conviction enhancements, defendant also moved the court "to conduct a diversion eligibility hearing under . . . section 1001.36 to qualify [defendant] for mental health diversion." Section 1001.36 had been enacted in June 2018 (Stats. 2018, ch. 34, § 24)—in the interregnum between defendant's January 2018 resentencing and our February 2019 remand for consideration of Senate Bill 1393 discretion. Defendant argued he was entitled to retroactively seek relief under section 1001.36 because it was an ameliorative statute presumed to apply to all cases not yet final. In arguing his eligibility under the terms of section 1001.36,[3] defendant reminded the court that Dr. Marvin Pietruszka, a defense expert witness at trial, testified defendant suffered from bi-polar and paranoid schizophrenia disorder. The defense also emphasized the pre-trial plea deal a prior judge had approved

---

[3] Section 1001.36 permits a trial court to grant mental health-based pretrial diversion "if it finds all of the following: (1) the defendant suffers from a qualifying mental disorder [including, but not limited to, bipolar disorder and schizophrenia]; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the defendant agrees to comply with treatment; and (6) the defendant will not pose an unreasonable risk of danger to public safety if treated in the community." (*Frahs*, *supra*, 9 Cal.5th at 626-627.)

(before later rescinding it) that called for a probationary sentence with dual-diagnosis treatment.

The prosecution opposed both of defendant's requests for relief. As to the trial court's discretionary authority to strike defendant's serious prior conviction enhancements, the prosecution argued the court should not exercise its discretion largely because of defendant's long and violent criminal history (including prior convictions for voluntary manslaughter, assault with a deadly weapon, and multiple violations of probation and parole). As to defendant's request for retroactive section 1001.36 mental health diversion, the prosecution argued the statute should not apply retroactively and, regardless, defendant could make no showing he was eligible for relief under the criteria specified in section 1001.36 even if it did apply retroactively. As to the latter of these arguments, the prosecution specifically contended defendant provided no evidence that any mental illness from which he suffered played a significant role in the offense of conviction and he posed an unreasonable risk of danger to public safety in any event. In addition to these statute specific arguments, the prosecution's opposition could also be read to argue the trial court should deny defendant's request for section 1001.36 relief because it was outside the scope of our remittitur (affirming in all respects other than considering Senate Bill 1393 relief) and the trial court therefore had no ability to grant it.

After hearing argument from counsel at a hearing, the trial court denied all relief sought by defendant and stated it would not change the existing 35 years to life sentence. Addressing defendant's request for mental health diversion, the court determined it had no jurisdiction to grant such relief because it was beyond the scope of this court's remittitur: "As to the mental

10

health diversion, they're not asking the court to do any type of hearing on mental health diversion.[4] [Defense counsel] has filed voluminous documents and [it] was well-briefed by both sides . . . . [¶] But the first issue is what's the court's authority, and the court's authority is limited by the scope o[f the] remittitur, and the case law is pretty clear on that, that as a reviewing court, the court has authority to—its jurisdiction is contained in the remittitur.  The rule requires a trial court to follow the terms of the remittitur, and that's jurisdictional in nature."  The court, of course, found it did have jurisdiction to consider whether to strike defendant's prior serious felony conviction enhancements, and as to those it declined to exercise its discretion in defendant's favor in light of his "long history of violence" and "numerous violations of probation and parole."

In elaborating on its reasons for declining to strike the prior serious felony conviction enhancements, the court also made reference back to defendant's request for mental health diversion: "[C]ounsel has asked the court to consider . . . defendant's mental illness in striking the two priors.  So in this regard whether to grant mental health diversion is beyond the scope of the remittitur, but I am going to address that issue in relation to striking the two [section] 667(a) priors.  And there was a mental defense presented at trial.  The jury rejected it.  I don't believe

---

[4]     The defense had planned to call defendant's brother to testify at the hearing, but he did not attend.  That may be what the trial court was referring to in stating the defense was not asking for "any type of hearing," but it is not correct to say the defense did not request a hearing to decide defendant's eligibility for mental health diversion—the defense (twice) made such a request in the written motion it filed.

11

there is sufficient evidence to believe that . . . defendant's mental disorder played a significant role in the commission of this offense. I don't believe his mental condition had, again, a significant role in the commission of the offense. [¶] And you just have to look at the factual scenarios in this case. [D]efendant knew what he was doing. He attempted to get his family to lie. So, again, I don't believe that that is a significant factor."[5]

## II

As the Attorney General concedes, the trial court's rationale for denying defendant's motion for retroactive mental health diversion is legally incorrect. The court was appropriately concerned with the scope of our remittitur, but the question of whether defendant is entitled to seek relief pursuant to the intervening enactment of section 1001.36 turns solely on whether defendant's conviction was final (in the legal sense) when the statute was enacted. (*Frahs*, *supra*, 9 Cal.5th at 640 ["By definition, a statute applies 'retroactively' to cases already past the procedural point at which the new law ordinarily applies—

---

[5] Later in the same hearing the court similarly remarked: "Again, just as to—because there is that motion for mental health diversion the court is not—is making its ruling regarding the mental health regarding the five-year priors, mental health diversion is not being asked by way of remittitur for the court to address, but I have addressed that issue in regards to the striking of the five-year priors, and I don't believe the mental health was a significant factor. And that's part of the reason, part of the reason why the court has declined to strike the five-year priors along with those other reasons I've stated."

12

here, cases that have already been adjudicated but are not yet final on appeal. At the time section 1001.36 became effective, defendant's case was adjudicated but the judgment was not yet final. Accordingly, he is entitled to the benefits of the statute's retroactive application"]; see also *People v. McKenzie* (2020) 9 Cal.5th 40, 45-46.) It was not, as defendant's appeal of the trial court's Senate Bill 1393 determination itself proves. (*People v. Superior Court (Rodas)* (2017) 10 Cal.App.5th 1316, 1325 ['"State convictions are final "for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." [Citations]'"]; see also *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308.)

The Attorney General accordingly argues for affirmance only on what amounts to harmless error grounds, i.e., the claim that a remand to decide defendant's eligibility for section 1001.36 relief would be pointless because the trial court already found any mental illness was not a significant factor in defendant's criminal threats offense and because the record already shows (even absent a trial court finding to this effect) that he poses an unreasonable risk of danger to public safety. As we go on to explain, we are unpersuaded on both counts and shall therefore order a conditional limited remand to decide defendant's eligibility for mental health diversion. Because the trial court's determination on remand might moot the question of whether its Senate Bill 1393 ruling was an abuse of discretion—or, if not, may still generate additional evidence that bears on that question—we defer resolution of that question for a fourth appeal, if such an appeal is filed.

13

A

Our Supreme Court's *Frahs* decision, in addition to holding that section 1001.36 applies retroactively to all non-final cases, also states what a defendant seeking retroactive application of the statute must show to obtain a conditional limited remand to decide his or her eligibility for mental health diversion. *Frahs* holds that where a defendant (like defendant in this case) was tried and convicted before section 1001.36 became effective, the defendant need not "show they would meet all threshold eligibility requirements before the appellate court may remand the case to the trial court—which decides in the first instance whether a defendant is eligible for diversion . . . ." (*Frahs*, *supra*, 9 Cal.5th at 638.) Instead, according to our Supreme Court, "a conditional limited remand for the trial court to conduct a mental health diversion eligibility hearing is warranted when, as here, the record affirmatively discloses that the defendant appears to meet at least the first threshold eligibility requirement for mental health diversion—the defendant suffers from a qualifying mental disorder (§ 1001.36, subd. (b)(1)(A))." (*Frahs*, *supra*, at 640.) The Court expressly reserved deciding, however, "whether an appellate court may also decline a defendant's remand request when the record clearly indicates the trial court would have found the defendant 'pose[s] an unreasonable risk of danger to public safety'" (*ibid*.) and the Court appeared to also leave open the possibility that a conditional limited remand might not be warranted if a trial court made "findings" that "conclusively establish" the defendant is unsuitable for diversion (*id*. at 638-639).

There is no dispute on appeal that defendant satisfies our Supreme Court's sole enumerated criterion for a conditional limited remand and, indeed, there is ample evidence in the record he suffers from bipolar disorder or schizophrenia, both of which are qualifying mental disorders under section 1001.36, subdivision (b)(1)(A). The Attorney General, however, argues it would be pointless to remand the matter in light of the trial court's remarks about defendant's asserted mental illness when stating its reasons for declining to strike his prior serious felony conviction enhancements. In the Attorney General's words, when "denying the motion to strike the five year priors, the court expressly considered appellant's mental health, as requested by the defense, and specifically found there was insufficient evidence appellant's mental health played a significant role in the commission of the offense." We are not persuaded, for four reasons.

First, it is not clear—to say the least—that the observations the trial court made when determining defendant's mental health was not reason to strike the prior serious felony conviction enhancements reliably translate to a determination that defendant cannot show his asserted mental illness played a significant role in the commission of his criminal threats offense. True, the court did remark there was insufficient evidence to believe defendant's mental disorder played a significant role in the commission of this offense, but the court at the same time cautioned it was only addressing "that issue in relation to striking the two [section] 667(a) priors." Our Supreme Court has explained section 1385's concept of furtherance of justice must be defined within the bounds of the statutory scheme at issue in the particular case (*People v. Williams* (1998) 17 Cal.4th 148, 160-

15

161) and we therefore lack confidence the court would make the precise same finding under the framework of section 1001.36 that it took care to say it was not addressing.

Second, even if the court's comments concerning defendant's mental health and the role it played or did not play in his offense of conviction did translate to the mental health diversion statutory scheme, we again lack confidence the court had in mind the correct legal standard. Section 1001.36, subdivision (b)(1)(B) states a defendant can be eligible for diversion only if his or her "mental disorder was a significant factor in the commission of the charged offense," and the statute further explains "[a] court may conclude that a defendant's mental disorder was a significant factor in the commission of the charged offense if . . . the defendant's mental disorder substantially contributed to the defendant's involvement in the commission of the offense." When the trial court stated it did not believe defendant's asserted mental illness played a significant role in the offense, however, it immediately followed that statement with the observation that defendant "knew what he was doing. He attempted to get his family to lie." This suggests the court had in mind a *M'Naghten*-type standard rather than the standard set by statute. (See generally *People v. Skinner* (1985) 39 Cal.3d 765, 768 ["For over a century prior to the decision in *People v. Drew* (1978) 22 Cal.3d 333[ ], California courts framed this state's definition of insanity, as a defense in criminal cases, upon the two-pronged test adopted by the House of Lords in *M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722]: '[To] establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing the act, the party accused was labouring under such

16

a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; *or*, if he did know it, that he did not know he was doing what was wrong"].) The probability of such a legal mistake again undermines the Attorney General's harmlessness argument.

With our third and fourth reasons, our discussion can be more brief. The trial court was right to acknowledge there was evidence of defendant's mental illness presented at trial (both in expert testimony and, to some degree, in the recorded phone calls and the testimony from defendant's brother). That is not to say the court must find the evidence persuasive, but the significant evidence presented, even when the precise question of mental health diversion was not at issue, suggests the question of whether defendant's mental health played a significant role in the offense is not an open-and-shut one. In addition, the pre-trial plea negotiations reveal at least one superior court judge (not the judge presiding during the hearing at issue in this appeal) initially approved a probationary sentence with dual-diagnosis treatment. That looks an awful lot like mental health diversion, and it is some evidence a diversionary disposition is not entirely beyond the pale.

With these reasons in mind, and considering the severe sentence imposed for the criminal threats offense, we do not believe a remand is pointless. The trial judge should have an opportunity to consider whether mental health diversion is appropriate and to state its reasons for its decision. We express no view on whether such relief should be granted.

17

B

In addition to arguing a remand is pointless, the Attorney General argues there is sufficient evidence for us to conclude the trial court would find defendant "pose[s] an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (b)(1)(F); see also § 1170.18, subd. (c) ["'[U]nreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of" section 667, subdivision (e)(2)(C)(iv); *People v. Valencia* (2017) 3 Cal.5th 347, 351 ["The cited subdivision of section 667 identifies eight types of particularly serious or violent felonies, known colloquially as 'super strikes'"].)

Assuming for argument's sake that we can consider defendant's dangerousness in the first instance (a question *Frahs* left open), we still do not believe "the record clearly indicates the trial court would have found the defendant 'pose[s] an unreasonable risk of danger to public safety.'" (*Frahs, supra*, 9 Cal.5th at 640.) The trial court did rely on defendant's extensive criminal record in declining to grant his *Romero* motion (a ruling we affirmed), but the *Romero* inquiry is not the same as the statutory inquiry, i.e., whether defendant poses an unreasonable risk of committing a super strike crime if treated in the community. Because the most violent aspects of defendant's prior criminal history are fairly remote, and because we have little information in the current record about the options available for treatment in the community, we cannot say it is clear the trial court would find defendant currently poses an unacceptable risk of committing a super strike crime.

18

DISPOSITION

The order denying defendant's motion for retroactive mental health diversion is conditionally reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.  If, after a hearing, the trial court finds defendant suffers from a mental disorder, does not pose an unreasonable risk of danger to public safety, and otherwise meets the six statutory criteria (as nearly as possible given the postconviction procedural posture of this case), then the court may grant diversion.  If defendant successfully completes diversion, then the court shall dismiss the charges.  If, however, the court determines defendant does not meet the criteria under section 1001.36, or if defendant does not successfully complete diversion, then his convictions and sentence shall be reinstated.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.


We concur:


RUBIN, P. J.


MOOR, J.


19